**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1358
_____

NEWARK CAB ASSOCIATION;
NEWARK TAXI OWNER ASSOCIATION;
TETERBORO AIRPORT LIMOUSINE SERVICE;
ABBAS ABBAS; PETRO ABDELMESSIEH;
SAYEV KHELLAH;
MICHAEL W. SAMUEL;
GEORGE TAWFIK, individually, and by certain plaintiffs
on behalf of others similarly situated

Appellants

v.

CITY OF NEWARK
_____

Appeal from the United States District Court
for the District of New Jersey
(No. 2-16-cv-04681)
District Judge: Hon. William H. Walls

Argued: September 6, 2017
_____

Before: CHAGARES, JORDAN, and HARDIMAN, <u>Circuit Judges</u>.

(Filed: August 20, 2018)

Richard W. Wedinger, Esq. **[ARGUED]**
Laurel A. Wedinger, Esq.
Barry McTiernan & Wedinger, P.C.
10 Franklin Avenue
Edison, New Jersey 08837

<u>Counsel for Appellants</u>


Eric S. Pennington, Esq.
James A. Lewis, Esq. **[ARGUED]**
Eric S. Pennington, P.C.
One Gateway Center, Suite 105
Newark, New Jersey 07102

<u>Counsel for Appellee</u>

_____

OPINION
_____

CHAGARES, Circuit Judge.

Newark Cab Association, Newark Taxi Owner Association, Teterboro Airport Limousine Service, Abbas Abbas, Petro Abdelmessieh, Sayev Khellah, Michael W. Samuel, and George Tawfik (collectively, the "plaintiffs") filed a lawsuit under 42 U.S.C. § 1983 and New Jersey law challenging an agreement the City of Newark (the "City") entered into with Uber Technologies Inc. ("Uber"). They alleged, inter alia, that the City violated their rights under the Takings Clause of the Fifth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment by subjecting Uber and other Transportation Network Companies ("TNCs") to less onerous regulations than those imposed on taxi and limousine operators. The City moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion, and dismissed the action with prejudice. This appeal followed. The City's decision to permit TNCs to operate subject to limited regulations places the plaintiffs in an undoubtedly difficult position. However, the potentially unfair situation created by this decision cannot be remedied through the plaintiffs' constitutional and state law claims. For the reasons that follow, we will affirm the order of the District Court.

I.

The plaintiffs are entities and individuals engaged in the licensed taxi and limousine industries in Newark, New Jersey. The City has regulated all for-hire transportation providers, such as the plaintiffs, under uniform regulations set forth in the City's municipal ordinances. Newark, N.J., Rev. Gen. Ordinances ("Newark Ordinances") §§ 34:1-1 to 34:2-24.

3

The regulations require taxi and limousine drivers, inter alia, to meet certain job qualifications, pass a background check conducted by the Newark Police Department, pay application fees, and obtain special commercial licenses. Taxi and limousine vehicles must be serviced and inspected every six months by the Division of Taxicabs, taxi fares must be measured and imposed by meters in accordance with City-mandated rates, and all taxi and limousine operators must carry primary commercial liability insurance. Taxi operators must purchase and possess a taxi medallion to provide taxi services. Taxi drivers are likewise prohibited from working at Newark airport until one year after the issuance of their taxi driver's license. The City capped the number of taxi medallions in circulation at 600.

In April 2016, Newark Mayor Ras Baraka announced an agreement between the City and Uber, under which Uber agreed to pay the City $1 million per year for 10 years and provide $1.5 million in liability insurance for each of its drivers in exchange for permission to operate in Newark (the "Agreement"). Uber also agreed to have a nationally-accredited third-party provider conduct background checks on all of its drivers. Under the Agreement, Uber and its drivers are not required to possess taxi medallions and Uber is permitted to set its own rates and fares. Nor are its drivers required to obtain commercial driver's licenses.

In August 2016, the plaintiffs filed a complaint against the City, bringing claims on behalf of a class of holders of taxi medallions and on behalf of a class of holders of limousine licenses who operate within Newark. The plaintiffs advanced claims for: (1) violations of the Takings Clause of the Fifth Amendment, as incorporated against the states by the

4

Fourteenth Amendment (Count 1); (2) violations of the Equal Protection Clause of the Fourteenth Amendment (Counts 2 and 3); (3) violations of their substantive due process rights (Count 4); (4) breach of contract under New Jersey law (Count 5); (5) promissory estoppel under New Jersey law (Count 6); and (6) equitable estoppel under New Jersey law (Count 7).  The City moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6).  The District Court dismissed the complaint.  The plaintiffs filed this timely appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We review a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) de novo.  Fleisher v. Standard Ins., 679 F.3d 116, 120 (3d Cir. 2012).  In doing so, we accept all factual allegations in the complaint as true and construe those facts in the light most favorable to the plaintiffs.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual allegations, taken as true, to 'state a claim to relief that is plausible on its face.'"  Fleisher, 679 F.3d at 120 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.

The plaintiffs raise several issues on appeal.  They first argue that the District Court erred by concluding that they had failed to allege a protectable property interest on which either their Takings Clause or substantive due process claims could be based.  They next argue that the District Court erred by

5

concluding that they failed to state a claim under the Equal Protection Clause. The plaintiffs finally argue that the District Court erred in dismissing their state law breach of contract, promissory estoppel, and equitable estoppel claims. We have considered the plaintiffs' arguments, and for the following reasons, we will affirm the District Court's order in all respects.

A.

The Fifth Amendment's Takings Clause prohibits the government from "taking private property for public use without providing just compensation." Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 370 (3d Cir. 2012). It applies to state and local governments through the Fourteenth Amendment. Id. To succeed on a takings claim, "the plaintiff[s] must first show that a legally cognizable property interest is affected by the Government's action in question." Prometheus Radio Project v. FCC, 373 F.3d 372, 428 (3d Cir. 2004); see also In re Trs. of Conneaut Lake Park, Inc., 855 F.3d 519, 526 (3d Cir. 2017) ("Without a legally cognizable property interest, [a plaintiff] has no cognizable takings claim."). Such property interests, in turn, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). Accordingly, we look to New Jersey law to determine the property interest at issue.

The plaintiffs argue that the District Court erred in determining that they have not been deprived of a legally cognizable property interest. They contend that, under New Jersey law, they have a property interest in their taxi medallions that has been affected by the Agreement with Uber.

6

The plaintiffs argue that they have a property interest in both the value of the medallions as well as the "inherent value of the exclusivity of the taxi medallion."  Plaintiffs' Br. 30.  They maintain that they do not seek to exclude TNCs and other operators from the market, but instead seek to subject TNCs to the same regulations as taxi operators.  They also argue that the City created a tightly controlled market when it established the regulations governing taxis and capped the number of taxi medallions at 600.  As a result, the plaintiffs assert that the medallions have economic value that has been decreased by the City's action in subjecting TNCs to less stringent regulation.

The plaintiffs rely upon an unpublished state court decision, Mohamed-Ali v. City of Newark, No. A-4035-11T4, 2013 WL 4859783 (N.J. Super. Ct. App. Div. Sept. 13, 2013), in support of their position that they have a property interest in the value of taxi medallions under New Jersey law.  In Mohamed-Ali, the Appellate Division of the Superior Court of New Jersey held that a "plaintiff had a property interest in his taxicab license."  Id. at *3.  However, the court in Mohamed-Ali did not hold that there was a property interest in the economic value of a taxi license.  There, the plaintiff was a taxi driver whose taxi license was suspended.  Id. at *1.  He argued that by suspending his license, the City deprived him of his property interest in the license without due process.  Id. at *2. The Appellate Division of the Superior Court of New Jersey held that the plaintiff had a property interest in his taxi license such that he was entitled to due process before it was suspended.  Id. at *3.  The court said nothing about whether this interest included the economic value of the license.  The plaintiffs have identified no other New Jersey authority indicating that the monetary value of a license constitutes a cognizable property interest.  As the Court of Appeals for the

7

Eighth Circuit held in considering a similar challenge, "a takings claim cannot be supported by asserting ownership in a property interest that is different and more expansive than the one actually possessed." Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis, 572 F.3d 502, 509 (8th Cir. 2009) (quoting Rogers Truck Line, Inc. v. United States, 14 Cl. Ct. 108, 114 (1987)). The plaintiffs have not shown that, under New Jersey law, their property interest in their taxi medallions extends to the economic value of those medallions.

But even crediting the plaintiffs' allegation that they have a legally cognizable property interest in the medallions themselves would not suffice to state a takings claim. The plaintiffs remain in possession of their taxi medallions. They remain able to use these medallions to conduct business. The taxi medallions have not physically been taken from the plaintiffs. Thus, the City's actions have not deprived the plaintiffs of the possession or use of their taxi medallions.

It is the economic value of the medallions that has changed as a result of the City's actions. The plaintiffs allege that before Uber began operating in Newark in 2013, the market value of a taxi medallion exceeded $500,000. Appendix ("App.") 50. They allege that by 2016, the market value of a taxi medallion had fallen below $220,000. Id. While unfortunate for the plaintiffs, the Supreme Court has "long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 645 (1993); see generally Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 677 (3d Cir. 1991) (holding that a takings claim cannot succeed unless the government "deprived [the plaintiffs] of all

8

economically viable uses of the property"), abrogated on other grounds by United Artists Theater Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003).[1]

That the market value of the taxi medallions derives from the City's regulations does not change the analysis. As the Court of Appeals for the Eighth Circuit has held, "[t]he general expectation of regulatory change is no less present where the value of the property interest is derived from the regulation itself." Minneapolis Taxi Owners Coal., 572 F.3d at 509; see also Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027-28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless."). Therefore, the decrease in the market value of the taxi medallions is not sufficient to constitute a cognizable property interest necessary to state a claim under the Takings Clause.

This conclusion finds further support in the fact that the City controls the number of taxi medallions in circulation and maintains the ability to flood the market with taxi medallions. According to the plaintiffs, the market value of the taxi medallions is derived from the fact that the number of taxi

---

[1] Relatedly, we have noted that a taking cannot be "established simply by showing the denial of 'the ability to exploit a property interest that [the plaintiffs] heretofore had believed was available.'" Keystone Bituminous Coal Ass'n v. Duncan, 771 F.2d 707, 713 (3d Cir. 1985) (alteration in original) (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 130 (1978)).

medallions in circulation is capped at 600. Even in the absence of the Agreement with Uber and other TNCs, if the City were to increase the supply of medallions by raising or removing the cap, the value of each individual medallion would decrease due to the increased supply of medallions.

The Court of Appeals for the Eighth Circuit reached this conclusion when confronted with a challenge to a Minneapolis ordinance that removed the limit on the number of transferable taxi licenses that were distributed by the city. Minneapolis Taxi Owners Coal., 572 F.3d at 508. There, because the ordinance neither revoked the existing licenses nor destroyed the ability of the license holders to use their licenses to do business, the court determined that "[t]he elimination of the market value of the taxicab licenses, however, can be considered a taking under the Fifth Amendment only if there is a protected property interest in that market value." Id. at 507. Looking to Minnesota law, the court determined that "[t]he taxicab licenses themselves do not carry an inherent property interest guaranteeing the economic benefits of using the taxicab license." Id. at 508.

The court rejected the plaintiffs' argument that because the market value of the licenses was created by the city when it initially capped the number of licenses made available, the property interest in the license extended to the value of using that license in the limited market. It held that the plaintiffs' claims failed because "any property interest that the taxicab-license holders' may possess does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market." Id. at 509. It further observed that the Minneapolis taxicab market was highly regulated, which came with an "understanding that the license to participate

10

in the highly regulated taxicab market is subject to regulatory change." Id. The court based this determination in part on the fact that "the City retained the discretion to alter the number of licenses." Id. This reasoning also supports our holding here.

Finally, the plaintiffs have provided no authority in support of their position that their taxi medallions include a right to be the exclusive providers of transportation services in Newark, or that this right constitutes a separate cognizable property interest that can be the subject of a Takings Clause claim. Indeed, the Supreme Court has acknowledged that "a mere unilateral expectation . . . is not a property interest entitled to protection." Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980). The Court of Appeals for the Seventh Circuit has observed in considering a similar challenge to the one before us, "[t]axi medallions authorize the owners to own and operate taxis, not to exclude competing transportation services." Ill. Transp. Trade Ass'n v. City of Chicago, 839 F.3d 594, 597 (7th Cir. 2016), cert. denied 137 S. Ct. 1829 (2017). That court determined that such a right to exclusivity was not a core property right that existed in the medallions absent a state law explicitly creating a property interest in that right. Id. We agree. Although the holder of a taxi medallion has the right to exclude others from the use of that medallion, he or she cannot prevent others from possessing their own medallions, acquiring additional medallions, or creating a competing business. See Checker Cab Operators, Inc. v. Miami-Dade County, No. 17-11955, ___ F.3d ___, 2018 WL 3721227, at *7 (11th Cir. Aug. 6, 2018) ("The [taxicab m]edallion [h]olders may exclude others from possessing, using, or disposing of their medallions. But the 'right to exclude' does not sanction the creation of a market stranglehold."); Bos. Taxi Owners Ass'n v. City of Boston, 180

11

F. Supp. 3d 108, 121 (D. Mass. 2016) ("[W]hatever property rights plaintiffs may possess in their medallions, those rights do not encompass a right to exclude others from the transportation-for-hire marketplace. For that reason, plaintiffs have failed to allege a taking of their property."). A right to exclude others from competition is not found in the City regulations governing taxis. For example, the holders of taxi medallions have no right to take legal action against someone who operates a taxi without possessing a medallion. The City's taxi regulations make it unlawful for those without a license to operate a taxi business, but do not give taxi medallion holders a private right to enforce these provisions. See Newark Ordinances §§ 34:1-3 & 34:1-21. Under the City's ordinances, only the City has that power.

The Court of Appeals for the Seventh Circuit's decision in Illinois Transportation Trade Ass'n, further supports our conclusion. There, the court analyzed the constitutionality of Chicago's ordinance regulating TNCs. The court observed that "[a] variant of such a claim would have merit had the City confiscated taxi medallions, which are the licenses that authorize the use of an automobile as a taxi. Confiscation of the medallions would amount to confiscation of the taxis: no medallion, no right to own a taxi." 839 F.3d at 596. However, the court held that because the plaintiffs remained in possession of their taxi medallions, their Takings Clause claim failed as they had not identified a property interest that had been taken. Id. at 597. The court held that Chicago had "created a property right in taxi medallions; [but] it ha[d] not created a property right in all commercial transportation of persons by automobile in Chicago." Id.

The plaintiffs do not have a legally cognizable property interest in the value of their taxi medallions or in the right to be the exclusive provider of ride-for-hire services in Newark. Therefore, the District Court properly dismissed their claim under the Takings Clause.

B.

The plaintiffs' substantive due process claim fails for the similar reason that they have not identified a protected property interest that meets a threshold for such a claim. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Substantive due process is a "component of the [Fourteenth Amendment] that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). We have recognized that "two very different threads" make up "the fabric of substantive due process": substantive due process relating to legislative action and substantive due process relating to non-legislative action. Nicholas v. Pa. State Univ., 227 F.3d 133, 139 (3d Cir. 2000). The plaintiffs' substantive due process claim is of the second variety.

The "threshold" to establishing a non-legislative substantive due process claim is that a plaintiff "has a protected property interest to which the Fourteenth Amendment's due process protection applies." Id. at 140 (quoting Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000), abrogated on other grounds by United Artists, 316 F.3d 392). This requires a showing that the property interest is of a

13

"particular quality" that is not determined by state law. Id. (quoting DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 600 (3d Cir. 1995), abrogated on other grounds by United Artists, 316 F.3d 392). Instead, this particular quality "depends on whether that interest is 'fundamental' under the United States Constitution." Id. Courts have been generally reluctant to expand the scope of substantive due process protection. See Collins, 503 U.S. at 125. Accordingly, the only protected property interests we have thus far deemed fundamental involved ownership of real property. Nicholas, 227 F.3d at 141.

We hold that the plaintiffs' alleged protected property interests — the loss of value of their medallions and the right to be the exclusive provider of ride-for-hire services in Newark — do not meet the standard of fundamental property interests under the Constitution. This conclusion is unsurprising because the plaintiffs similarly failed to establish a protected property interest under the less-exacting standard of the Takings Clause. The property interest proffered to meet the substantive due process threshold here is akin to those we have previously rejected, such as the "ability to earn a living" and being terminated from a public job, Hill v. Borough of Kutztown, 455 F.3d 225, 234 n.12 (3d Cir. 2006), being actively prevented from winning city contracts in violation of a consent decree with the city, Indep. Enters. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1179-80 (3d Cir. 1997), and losing contracts because a plaintiff was termed a "crook" by a government employee, Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 401-04 (3d Cir. 2000). As a result, the District Court did not err in dismissing the plaintiffs' substantive due process claim.

14

C.

The plaintiffs next argue that the District Court erred in dismissing their Equal Protection claims. We do not agree.

The Fourteenth Amendment's Equal Protection Clause admonishes that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The plaintiffs press a "class of one" theory of equal protection jurisprudence. See Village of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000) (per curiam). To state a claim under a class of one theory, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill, 455 F.3d at 239.

Rational basis review is a very deferential standard. It is met "if there is any reasonably conceivable state of facts that could provide a rational basis" for the differing treatment. United States v. Walker, 473 F.3d 71, 77 (3d Cir. 2007) (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)). We have held that "the principles of equal protection are satisfied 'so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'" Id. (quoting Fitzgerald v. Racing Ass'n of Cent. Iowa, 539 U.S. 103, 107 (2003)). The Supreme Court has emphasized that "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" Heller,

15

509 U.S. at 319 (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).

The plaintiffs argue that the City's justifications for permitting TNCs to operate in Newark under a different set of regulations than those that apply to taxi companies are arbitrary and irrational. They insist that there are no real differences between taxis and TNCs, and that the differences identified by the City and articulated by other courts are illusory. The City responds that it has legitimate reasons for treating taxi operators and TNCs differently that are sufficient to survive rational basis review. The City contends that the salient differences between taxis and TNCs are that: (1) users enter into a contract with TNCs before using the service and have access to significant information about their driver before stepping into the car; (2) taxis can be hailed on the street whereas a TNC must be summoned using a digital application; and (3) taxi fares are prescribed by City regulations.

The most significant difference between taxis and TNCs is that customers can arrange a ride with a taxi by hailing one on the street, whereas to arrange a ride with a TNC, a customer must request one through a digital application. After being matched with a driver, the customer is provided with information about that driver, including the driver's name and photograph, the make and model of the car, and its license plate number. App. 60-62, 96. The customer also receives the fare rate and an estimation of the total fare. App. 60-62. This information is provided to the customer pursuant to the contractual relationship that he or she entered into with the TNC when setting up an account with the TNC. See App. 96. A customer obtains all of this information before he or she enters a vehicle. In contrast, a customer who hails a taxi on the

16

street may be able to observe the make and model of the vehicle, but does not know the driver's identity before he or she enters the vehicle. A customer who hails a taxi on the street knows what the fare rate will be because the metered fare is set by City regulation. In the absence of a set fare rate, the customer would have no way of knowing the fare rate until he or she entered the vehicle.

It is rational for the City to determine that customers require greater protections before accepting a ride from a taxi that they hail on the street than before accepting a ride from a TNC where they are given the relevant information in advance. A customer can immediately obtain a fare estimate from various TNC companies through the digital applications on his or her phone, and comparison shop among those companies before requesting a ride to ensure that he or she receives a fair price. In contrast, customers do not have this same level of information available to them before hailing a taxi ride. In the absence of City regulation setting the fare rate, it would not be practical for a customer hailing a ride on the street to comparison shop among several taxi companies, as that would entail hailing multiple taxis and inquiring about the price. Therefore, it is reasonable for the City to set the fare rate for taxis, but not for TNCs, to ensure that customers receive consistent pricing.

The City's regulations setting more stringent driver qualification standards and requiring certain vehicle safety features for taxis also function to provide greater protections to customers hailing a taxi on the street than when accepting a pre-arranged ride with a TNC. Although customers might benefit if TNCs were also subject to these same regulations, the City could rationally conclude that these requirements are necessary to protect customers who hail a taxi on the street and

17

have no other protections, but not for customers of TNCs, since they have some degree of protection due to their preexisting contractual relationship with the TNC. Accordingly, "it makes sense therefore for the City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform system of rates based on time or distance or both." Ill. Transp. Trade Ass'n, 839 F.3d at 598. Thus, the City's position that stricter regulations are required to protect taxi customers is at least rationally related to the City's interest in providing safe access to transportation.

The plaintiffs contend that these justifications do not constitute a rational basis for different treatment because there is no real difference between hailing a cab and requesting a TNC through a digital application. When requesting a ride on a digital application, a customer does not select between drivers, but instead is matched with a driver by the application. In this situation the customer has the same degree of choice about the identity of the driver and vehicle as he or she does when hailing a cab on the street with a raise of the hand. At the moment the ride is requested, the same information is available to the customer.

Even so, there are still differences between the two processes. When requesting a ride from a TNC, the customer is matched with a driver a few minutes before the vehicle arrives, whereas a taxi customer immediately is matched with a taxi when that taxi pulls over. These few minutes give the customer time to consider the available information before entering a vehicle, which is time that a taxi customer might not have. A customer can use this extra time to cancel a requested ride. Although a customer who hails a taxi can cancel that request by not entering the taxi, that customer has less time to make that decision than does a TNC customer. Under the

18

highly deferential standard of rational basis review, the City could reasonably conclude that this is a sufficient distinction in customer experience to warrant stricter regulation of taxis.

Finally, relying on the opinion of the district court in Boston Taxi Owners Ass'n, the plaintiffs contend that because the identified differences between taxis and TNCs result from the City's regulation of taxis and not TNCs, the City cannot rely on those differences as its rational basis for the disparate regulatory schemes. See 180 F. Supp. 3d at 118 ("The City may not treat the two groups unequally and then argue that the results of that unequal treatment render the two groups dissimilarly situated and, consequently, not subject to equal protection analysis. Such circular logic is unavailing."). The plaintiffs point out the fact that taxis' fares are set by the City's regulations, while the TNCs' fares are not. Similarly, they contend that the City regulates the qualifications of taxi drivers and the background checks that they must undergo, while TNCs are responsible for handling these and similar matters on their own.

The Equal Protection Clause does not prevent the City from setting up a multi-tiered regulatory regime, as long as it has a rational basis for the distinctions it creates. That is what the City has done here. Taxi companies and TNCs each provide for-hire transportation services. Each is subject to some degree of regulation. A customer can pre-arrange a ride with either service, through the use of a digital application for TNCs or a telephone call for taxis. However, taxis are permitted an additional privilege that is not available to TNCs: the power to accept customers by way of street hails. As a result, taxis are subject to stricter regulatory control. These heightened regulations, as previously discussed, relate to the exclusive ability of a taxi to accept a street hail.

It is not irrational for a city to create a system in which a more tightly regulated service (here, taxis) enjoys additional privileges — the ability to obtain customers by way of street hails — that are not available to the less regulated alternative (here, TNCs). To be sure, because the City here did not create this tiered system from its inception but instead permitted TNCs to operate at a much later time than the less-regulated alternative, its justification for not subjecting them to the same regulatory requirements as taxis may appear to be unfair.

Street hails are not part of the business model of TNCs. Thus, by setting street hails as the benchmark for heightened regulation, it gives the impression that the City has permitted TNCs to escape the regulations imposed on taxis, and to provide a very similar service, without a substantial impact on their business operations. The City's actions in permitting TNCs to operate essentially comparable services with lower regulatory compliance costs may appear unfair to those who operate taxis and have relied on the existence of the regulatory framework in investing in their taxi businesses. Although we recognize the difficult position in which the plaintiffs are placed by the City's decision to permit TNCs to operate subject to limited regulations, an Equal Protection Clause claim is not the proper avenue to address this unfairness. And while protecting reliance interests can be considered a rational basis behind government action, the plaintiffs have provided no authority for the position that a choice not to protect reliance interests would be irrational and constitute a violation of the Equal Protection Clause. Cf. Nordlinger v. Hahn, 505 U.S. 1, 13 (1992) ("This Court previously has acknowledged that classifications serving to protect legitimate expectation and reliance interests do not deny equal protection of the laws.").

20

Because there are rational reasons for the City's choice to draw the regulatory line at the ability to accept a street hail, this distinction is sufficient to satisfy the principles of equal protection. Walker, 473 F.3d at 77.[2]

Other courts that have considered similar challenges under the Equal Protection Clause are in accord with our conclusion. In Illinois Transportation Trade Ass'n, the Court of Appeals for the Seventh Circuit examined what it viewed as the differences between TNCs and taxis and concluded that these

---

[2] The City also argues that the plaintiffs' claims are "precluded" by the Transportation Network Company Safety and Regulatory Act (the "TNCSRA"), N.J. Stat. Ann. § 39:5H-1, et seq. City Br. 19 n.2. The City contends that the TNCSRA precludes the plaintiffs from obtaining the relief they seek through their complaint, as it prevents the City from subjecting TNCs to additional regulations. Id. The TNCSRA, which became effective on May 1, 2017, regulates TNCs within New Jersey. N.J. Stat. Ann. § 39:5H-1-3. The TNCSRA gives the state the power to issue permits to TNCs, which allows them to operate within the state, provided that they meet certain requirements laid out in the statute. Id. § 39:5H-4.

Through this action, the plaintiffs have not brought a challenge to the TNCSRA. The effect, if any, that the TNCSRA has on this case has not been fully briefed. The parties at oral argument each took the position that the TNCSRA does not prevent this Court from reaching the merits of the issues raised on this appeal. Because the plaintiffs' claims fail for the aforementioned reasons, we need not determine what effect, if any, the TNCSRA has on the plaintiffs' requested relief.

21

differences justified the City's disparate treatment of the two. 839 F.3d at 598. The court identified the following differences: (1) customers can hail a cab, but must create a contractual relationship with a TNC before requesting a driver via a digital application; (2) TNCs "assume[] primary responsibility for screening potential drivers" before hiring them, taxi services do not; (3) customers "receive more information in advance about their prospective rides" from TNCs, including "not only the driver's name but also pictures of him (or her) and of the car"; and (4) TNCs employ part time drivers who are believed to "drive their cars fewer miles on average than taxicab drivers, who are constantly patrolling the streets in hope of being hailed," which means that their vehicles are "less likely . . . to experience wear and tear that may impair the comfort of a ride in [them] and even increase the risk of an accident or a breakdown." Id. The court reasoned that these differences were rational because

> [t]axis but not [TNCs] are permitted to take on as passengers persons who hail them on the street. Rarely will the passenger have a prior relationship with the driver, and often not with the taxicab company either; and it makes sense therefore for the City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform system of rates based on time or distance or both.

Id.;[3] see also Checker Cab Operators, ___ F.3d ___, 2018 WL 3721227, at *12 ("[T]he[] equal protection claims fail because

---

[3] Numerous district courts have found that these differences constitute a rational basis sufficient to overcome similar Equal Protection Clause challenges brought by taxi

22

any disparate regulatory treatment that the County afforded taxicabs and [TNCs] was amply supported by legitimate government interests.").

In sum, the City had a rational basis for treating TNCs and taxi operators differently. These differences also demonstrate that TNCs and taxi operators are not similarly situated for purposes of their "class of one" claims. See Progressive Credit Union v. City of New York, 889 F.3d 40, 51 (2d Cir. 2018) ("We conclude these differences mean that medallion taxicabs and [for-hire vehicles] are not prima facie identical for 'class of one' purposes and that they provide a rational basis for the different regulatory treatment applied to each group."). The plaintiffs, therefore, cannot succeed on their class of one equal protection claims and the District Court did not err in dismissing these claims.

## D.

Finally, the plaintiffs contend that the District Court erred in dismissing their claims for breach of contract, promissory estoppel, and equitable estoppel under New Jersey law on the grounds that City regulations making taxi drivers the exclusive providers of ride-for-hire services in Newark constituted a contract or a promise to them that the City breached when it entered the Agreement with Uber. We do not agree and will affirm dismissal of the plaintiffs' state law claims.

---

companies. See, e.g., Miadeco Corp. v. Miami-Dade County, 249 F. Supp. 3d 1296, 1303-04 (S.D. Fla. 2017); Melrose Credit Union v. City of New York, 247 F. Supp. 3d 356, 368-69 (S.D.N.Y. 2017); Desoto Cab Co. v. Picker, 228 F. Supp. 3d 950, 960 (N.D. Cal. 2017); Gebresalassie v. District of Columbia, 170 F. Supp. 3d 52, 61-62 (D.D.C. 2016).

1.

Under New Jersey law, "[t]o state a claim for breach of contract, [a plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007). In New Jersey, "a statute may be construed as creating a contract when the Legislature's intent to create a contractual commitment is 'so plainly expressed that one cannot doubt the individual legislator understood and intended it.'" Burgos v. State, 118 A.3d 270, 282 (N.J. 2015) (quoting Spina v. Consol. Police & Firemen's Pension Fund Comm'n, 197 A.2d 169, 176 (N.J. 1964)). In such a situation, "clarity of language is necessary if a statute is to be regarded as having been intended to create contractual rights." Id.

We are not convinced that the City intended to create contractual rights through its regulation of taxi services. The plaintiffs argue that the City's intent to create a contract can be found in the Newark Ordinances (1) requiring taxi operators to be licensed,[4] (2) outlawing taxis licensed in other municipalities

---

[4] Newark Ordinances § 34:1-3 provides:

No person shall operate or permit a taxicab owned or controlled by him/her to operate as a taxicab upon the streets of the City of Newark without first having obtained a taxicab license and/or a license renewal from the Manager, after review by the Taxicab Commission.

24

from operating within Newark without a license,[5] (3) placing

---

It shall be unlawful or a violation of this chapter for taxicabs licensed in other municipalities or states to receive passengers in the City of Newark and regularly discharging passengers originating in other municipalities or states in the City of Newark without obtaining a licensed from the Manager, Office of Taxicabs.

[5] Newark Ordinances § 34:1-7 provides:

No taxicab license may be sold, assigned or otherwise transferred without the consent of the Manager upon recommendation of the Taxicab Commission. A license may be transferred to another person to be used in a bona fide operation of a taxicab business, with the consent of the Manager upon recommendation of the Taxicab Commission upon the filing of an application, as provided in Section 34:1-4 of these Revised General Ordinances, and upon payment of a transfer fee of five hundred ($500.00) dollars and in the case of a transfer to a corporation, a copy of the certificate of incorporation issued by the State of New Jersey and the name of its registered agent shall also be filed; provided that if a corporation wishes to transfer a taxicab license to another corporation to be used in a bona fide operation of a taxicab business, and not less than seventy-five (75%) ownership of each corporation rests with the same person or group of persons, then upon application and upon filing

25

restrictions on the transfer of licenses,[6] and (4) limiting the number of licenses issued to 600.[7] The plaintiffs argue that these provisions constitute a promise of exclusivity to taxi operators that the City breached by permitting TNCs to operate within Newark. But these provisions do not "use[] terminology that plainly expresse[s] [the City's] intent to create contractual rights." Id. In the absence of such express language creating contractual rights, the Newark Ordinances do not create a contract under New Jersey law. Id.

2.

We turn to the plaintiff's claims for promissory and equitable estoppel. The elements of promissory estoppel under New Jersey law are: "1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." E. Orange Bd. of Educ. v.

---

of a certificate of incorporation issued by the State of New Jersey and the name of its registered agent, and the consent of the Manager upon recommendation of the Commission, and upon payment of an administrative fee of one hundred ($100.00) dollars, the license shall be transferred. No transfer may be made during the month of November.

[6] See id.

[7] Newark Ordinances § 34:1-5(c) provides that "[t]he number of licenses issued and in use in the City at any one time shall not exceed six hundred (600)."

26

N.J. Sch. Const. Corp., 963 A.2d 865, 875 (N.J. Super. Ct. App. Div. 2009) (quoting Lobiondo v. O'Callaghan, 815 A.2d 1013, 1020 (N.J. Super. Ct. App. Div. 2003)). The New Jersey Supreme Court has held that "to establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." Id. at 873 (quoting Knorr v. Smeal, 836 A.2d 794, 799 (N.J. 2003)).

We are not persuaded that the plaintiffs' have stated promissory or equitable estoppel claims. The plaintiffs argue that the City's regulations promised taxi license holders that if they complied with the regulations then the City would provide them with certain rights including exclusivity, market support, and enforcement of the regulations. The Newark Ordinances, however, do not contain a "clear and definite promise" by the City that it would guarantee the plaintiffs any of these rights. Cumberland Farms, Inc. v. N.J. Dep't of Envtl. Prot., 148 A.3d 767, 778 (N.J. Super. Ct. App. Div. 2016). The plaintiffs have thus failed to meet this essential element of a promissory estoppel claim. This absence of any clear promise on the part of the City also dooms the equitable estoppel claim.

## IV.

For the foregoing reasons, we will affirm the order of the District Court.

27