NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2991
_____

RITTENHOUSE ENTERTAINMENT, INC.; THE MINES, INC.; G NET COMM. CO.;
PHOENIX ESTATES; THOMAS J. GRECO,
                                                           Appellants

v.

CITY OF WILKES-BARRE; THOMAS LEIGHTON, individually and as the Mayor of
Wilkes-Barre; GERALD DESSOYE, individually and as Chief of Police of Wilkes-
Barre; J.J. MURPHY, individually and as City Administrator of Wilkes-Barre; TONY
THOMAS, JR., individually and as members of the Wilkes-Barre City Council; KATHY
KANE, individually and as members of the Wilkes-Barre City Council; WILLAM
BARRETT, individually and as members of the Wilkes-Barre City Council; RICK
CRONAUER, individually and as members of the Wilkes-Barre City Council;
MICHAEL MERRITT, individually and as members of the Wilkes-Barre City Council;
BUTCH FRATI, individually and as Director of Operations of Wilkes-Barre; LUZERNE
COUNTY; MICHAEL SAVOKINAS, individually and as Luzerne County Sheriff;
KING'S COLLEGE; FATHER THOMAS J. O'HARA, individually and as Officers and
Employees of Kings College; ROBERT MCGONIGLE, individually and as Officers and
Employees of Kings College; PAUL LIDENMUTH, individually and as Officers and
Employees of Kings College; JOHN MCANDREW, individually and as Officers and
Employees of Kings College

_____

On Appeal from the United States District Court for the
Middle District of Pennsylvania
(No. 3-11-cv-00617)
District Judge A. Richard Caputo

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 27, 2019

Before:  CHAGARES, GREENAWAY, JR., and GREENBERG, <u>Circuit</u> <u>Judges</u>.

(Filed: August 26, 2019)
_____

OPINION[*]
_____

CHAGARES, Circuit Judge.

Thomas Greco and his associated corporations[1] (collectively, "plaintiffs") filed

suit alleging equal protection and due process violations for actions taken against his

nightclub, The Mines. The plaintiffs appeal the District Court's grant of summary

judgment in favor of the City, College, and County Defendants[2] on all claims. The parties

do not dispute that The Mines served a higher percentage of minorities than did

neighboring bars. Nor do they dispute that the neighborhood suffered from a high crime

rate. But the parties dispute whether the concentrated police presence around The Mines

was due to a higher incidence of crimes in that area or the fact that The Mines served

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The plaintiffs include G Net Comm. Co., Phoenix Estates, Thomas J. Greco, Rittenhouse Entertainment, Inc., and The Mines, Inc.

[2] The City Defendants include the City of Wilkes-Barre; Thomas Leighton, individually and as Mayor; Gerard Dessoye, individually and as Chief of Police; J.J. Murphy, individually and as City Administrator; Tony Thomas, Jr., Kathy Kane, William Barret, Rick Cronauer, and Michael Merritt, individually and as members of City Council; and Butch Frati, individually and as Director of Operations. The College Defendants include King's College; Father Thomas J. O'Hara, individually and as an Officer and Employee of King's College; and Robert McGonigle, individually and as an Officer and Employee of King's College. The County Defendants include the County of Luzerne; Michael Savokinas, individually and as Luzerne County Sheriff.

more minorities.  Because there is enough evidence for a reasonable jury to infer discriminatory intent, we will vacate and remand in part and affirm in part.

I.

The following background comes from the evidentiary record before the District Court, and on appeal from a grant of summary judgment, the facts are construed in the light most favorable to the non-moving party.[3]  Greco is the owner and operator of The Mines, a bar and nightclub in Wilkes-Barre, Pennsylvania.  King's College, a private and Catholic college, is located across the street from The Mines. The Mines opened in September of 2008 and operated on Thursday, Friday, and Saturday nights, averaging between 400 and 800 customers each night.  About 30–40% of The Mines' clientele were members of a racial minority, primarily black and Hispanic, and The Mines served more minorities than neighboring bars.  Chief of Police Gerald Dessoye testified that he did not know the racial composition of The Mines' patrons but that the bars in Wilkes-Barre "are diverse," Appendix ("App.") 1597, and he told Greco, "you've got the wrong kind of crowd" at The Mines.  App. 3006.  Chad Williams, who lived above The Mines and sometimes worked there, encountered Father O'Hara, the president of the College, while

---

[3] The parties dispute whether the District Court abused its discretion in handling the plaintiffs' failure to comply with Local Rule 56.1.  The plaintiffs submitted their own Statement of Undisputed Material Facts instead of responding to the moving parties' statements.  The District Court applied the proper standard, "conduct[ing] a full analysis [of the record] to determine whether granting summary judgment was appropriate." Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 614 (3d Cir. 2018).  The court did not abuse its discretion.

3

walking his dog. Williams invited Father O'Hara to come inside The Mines, but Father O'Hara refused because the "crowd was too dark for [his] students." App. 5912.

The Hardware Bar is located a few blocks from The Mines and served fewer minorities than The Mines. Chief Dessoye described it as "a problem bar." App. 1586. Officer Donald Crane testified that the police allocated more resources toward the Hardware Bar than The Mines; "[w]e were definitely down at the Hardware Bar more often" responding to issues. App. 1356. In March 2009, Officer Erika Oswald was assaulted outside the Hardware Bar, leaving her unconscious from a traumatic head injury. But Chief Dessoye did not increase police presence in front of the Hardware Bar thereafter. While the Hardware Bar addressed its issues by privately hiring Wilkes-Barre police officers to work security, Greco's request to do the same was denied.

The neighborhood around The Mines and the College suffered from a crime problem. The police reported that on March 27, 2009, a fight broke out in front of The Mines involving about 200 people and overwhelming the police. But Greco witnessed the fight and testified that only 50 people were involved. When he told this to Chief Dessoye, the Chief responded, "sometimes they embellish the report" and maybe the report was "exaggerated." App. 3010, 3006.

Crimes specifically against the College students included a stabbing, a fight resulting in a broken jaw, and an incident involving a gun and a knife. Students and parents complained about campus safety and considered transferring due to safety concerns. The College hosted a public forum to discuss campus safety issues. Robert McGonigle, the Dean of Students, coordinated the event with the Wilkes-Barre police

4

department. McGonigle sent an email to the students informing them of the campus safety forum; The Mines was mentioned twice in the email, while no other bar was mentioned. The College prepared a document with anticipated questions, one of which was why the College had not closed down The Mines. J.J. Murphy, the Wilkes-Barre city administrator, Father O'Hara, and Chief Dessoye were present at the forum. Father O'Hara denied Greco's request to attend. On April 8, 2009, Father O'Hara, Mayor Leighton, and Chief Dessoye met to discuss how the issues in the area would be addressed. Thereafter, Father O'Hara told Greco, "either we're going to petition to close The Mines or the parents [of the College students] are going to petition to close The Mines. And I'm going to talk to Mayor Tom and Chief Dessoye about how we're going to continue to go about closing down The Mines." App. 3010. A police officer in front of The Mines also told the manager "we are closing your boss down." App. 1156.

On April 30, 2009, the Wilkes-Barre police department carried out a "saturation patrol" spanning a few blocks surrounding The Mines. This type of police action "saturates" a specific neighborhood with law enforcement to address crime. Multiple law enforcement entities participated in the saturation patrol at the request of the Wilkes-Barre police department, including the Luzerne County Sherriff's Office, Luzerne County Probation and Parole, State Parole and Probation, the Pennsylvania Liquor Control Board, and the Pennsylvania State Police Gang Unit. Luzerne County Sheriff Savokinas had agreed to help other law enforcement entities when asked for assistance in the past, so when Chief Dessoye asked for County manpower for one night, the Sheriff agreed. Jennifer Roberts, a Deputy Sheriff in the Luzerne County Sheriff's Office, participated in

5

the saturation patrol. She testified that "[a]lmost all of" the Wilkes-Barre police officers told her that the purpose of the saturation patrol was to deal with The Mines. App. 5287. Specifically, Deputy Sheriff Roberts testified that Officer Rennick, her personal friend, told her that The Mines is a "problem bar, and we don't want these kind of people in our town." App. 5287. She further testified that Officer Rennick was referring to "black people, Hispanic people." App. 5287.

The concentrated police presence around The Mines did not begin and end with the saturation patrol on April 30. Every Thursday, Friday, and Saturday night beginning in April 2009, the Wilkes-Barre police would park on the sidewalk in front of and across from The Mines; park in and block the entrance to The Mines' parking lot; and stand at the entrance to The Mines with a drug-sniffing dog. These actions deterred customers from entering The Mines. Greco drove to the neighboring bars every Thursday, Friday, and Saturday to see if the police did the same elsewhere. They did not. Within months, The Mines went out of business.

Meanwhile, some of Greco's properties that had Keystone Opportunity Zone ("KOZ") designation were then denied that designation on his application to extend. KOZ is a Pennsylvania state tax benefit program designed to encourage property owners to bring business to certain under-developed areas. This is accomplished through local and state tax waivers, abatements, or exemptions. Some of Greco's properties in Wilkes-Barre already had KOZ designation. But around the same time The Mines was subject to significantly greater police presence, Greco's application to extend the KOZ designation

6

of his properties was denied. The parties disagree as to whether his application to extend was timely and contained the necessary information.

In 2010, Greco pleaded guilty in federal court to the felony of misprision for failing to report corruption in violation of 18 U.S.C. § 4. Greco bought televisions for a county commissioner and failed to disclose the manner in which he was paid back.

The plaintiffs filed a lawsuit against the City, College, and County Defendants in 2011 for violations of due process, equal protection, and various other statutory and state causes of action. The plaintiffs alleged that the defendants conspired to shut down The Mines through concentrated police presence due to the fact that The Mines served more minorities than any neighboring bar. The plaintiffs also alleged that the denial of KOZ renewal was a result of the discrimination, and that Greco's charge and conviction for misprision was retaliation for threatening to sue. The following counts survived the defendants' motions to dismiss: (1) plaintiffs' §§ 1983 and 1985 claims against the City, County, and College Defendants, for the alleged violations of plaintiffs' Fourteenth Amendment Equal Protection rights (Count One); (2) plaintiffs' §§ 1981 and 1982 claims against Mayor Leighton, Chief Dessoye, the City of Wilkes-Barre, plaintiffs' § 1985 claims against all City Defendants,[4] and plaintiffs' §§ 1981, 1982, and 1985 claims against the College Defendants, for the alleged retaliation against plaintiffs for serving minorities (Count Two); (3) plaintiffs' Fourteenth Amendment Due Process claims

---

[4] While the Plaintiffs did not specify the subsection under which they are proceeding, the District Court assumed it was § 1985(3), as that is the only relevant subsection. We will do the same.

7

against all defendants for alleged abuse of police powers (Count Three); (4) plaintiffs' substantive due process claims against the City of Wilkes-Barre, Mayor Leighton, and City Council Members for the alleged improper denial of Greco's KOZ applications (Count Four); (5) plaintiffs' tortious interference with business relationships claim against the City and College Defendants (Count Five); and (6) plaintiffs' claims against Mayor Leighton and Chief Dessoye for allegedly manipulating Greco into committing misprision (Count Six). Rittenhouse Entm't, Inc. v. City of Wilkes-Barre, No. 3:11-617, 2012 WL 3562030, at *18 (M.D. Pa. Aug. 16, 2012).

The District Court granted summary judgment for the defendants on Counts One, Two, Three, Four and Six and dismissed Count Five. The plaintiffs timely appealed.

## II.

The District Court exercised jurisdiction under 28 U.S.C. §§ 1331, 1343, and declined to exercise supplemental jurisdiction under § 1367(c)(3). We have appellate jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo. Renchenski v. Williams, 622 F.3d 315, 324 (3d Cir. 2010). "Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. We view the facts in the light most favorable to the non-moving party." Buhdun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 251 (3d Cir. 2014) (citations omitted).

## III.

We conclude that summary judgment was improper on Counts One, Two, and Three ("the discrimination claims") against the City and College Defendants but that it

8

was proper on all claims against the County Defendants. We also affirm on Counts Four and Six. On remand, in addition to considering the discrimination claims, the District Court should also consider Count Five — the state law tortious interference claim — as well as the issue of qualified immunity for the City Defendants in the first instance.

A.

The discrimination claims raise distinct constitutional and statutory causes of action, but common among them is the element of intentional discrimination on the basis of race. These claims include violations of the Equal Protection Clause and the Due Process Clause under 42 U.S.C. § 1983, violations of §§ 1981, 1982, and conspiracy to commit them under § 1985. To allege a racial discrimination claim under the Fourteenth Amendment's Equal Protection Clause, a plaintiff must allege "racially discriminatory intent or purpose." City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found., 538 U.S. 188, 195 (2003) (citation omitted). Similarly, a claim for abuse of police power that violates substantive due process requires "conduct intended to injure" that "rise[s] to the conscience-shocking level." Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998). And "bias against an ethnic group" is "conscience-shocking behavior." Chainey v. Street, 523 F.3d 200, 220 (3d Cir. 2008). So, use of the police power to discriminate intentionally on the basis of race violates substantive due process. Likewise, an element of both §§ 1981 and 1982 is intentional racial discrimination. Brown v. Phillip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001). Section 1981 gives all persons the right to make and enforce contracts and § 1982 provides various real and personal property rights. 42 U.S.C. §§ 1981, 1982. Discriminatory intent requires that the decision-maker took "a

9

particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Antonelli v. New Jersey, 419 F.3d 267, 274 (3d Cir. 2005) (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).

The District Court granted summary judgment on these claims because it found no evidence of racially discriminatory intent. We disagree. There is evidence that the City Defendants concentrated the police presence around The Mines "at least in part 'because of,'" Antonelli, 419 F.3d at 274, the race of The Mines' clientele. Specifically, the City Defendants' statements — "you've got the wrong kind of crowd" and "we don't want these kind of people in our town," referring to "black people, Hispanic people" — give rise to an inference of discriminatory intent. App. 3006, 5287. Moreover, there is evidence that only The Mines was singled out, while other bars, such as the Hardware Bar, that served fewer minorities but had plenty of incidents requiring police response, were not subject to similar treatment by police. And while the City Defendants argue that such disparate treatment was warranted because of the March 27 event, the size of that fight is disputed. The same is true of the College Defendants. While they are not state actors, they are not immunized from liability because "a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of [section] 1983." Abbot v. Latshaw, 164 F.3d 141, 147–48 (3d Cir. 1998). And there is evidence that the College Defendants conspired with the City Defendants to shut down The Mines because of the race of its patrons. Father O'Hara's statement that the crowd at The Mines was "too dark for [his] students" suggests discriminatory intent. App. 5912. Dean McGonigle's email about the

10

student forum mentioned only one bar, The Mines, suggesting that he singled out The Mines from the neighboring, white-clientele bars. And Father O'Hara's statement that he was working with the mayor and the chief of police "about how we're going to continue to go about closing down The Mines" suggests an agreement among the defendants. App. 3010.

Accordingly, the plaintiffs' § 1983 and § 1985 claims alleging violations of equal protection against the City and College Defendants should have survived summary judgment because a reasonable jury could infer that they agreed to deprive The Mines of equal protection of the law due to the race of The Mines' patrons. This evidence of intentional racial discrimination concerned contract and property rights enumerated in § 1981 and § 1982 — such as the financial transaction of selling a drink at the plaintiffs' bar — so summary judgment on these claims for the City and College Defendants was improper. Likewise, the substantive due process claims brought under § 1983 and § 1985 for abuse of police power and conspiracy to abuse police power also survive summary judgment because a jury could reasonably infer that the City and College Defendants agreed to discriminate intentionally on the basis of race by deliberately concentrating police power on the bar that serves minorities, and in so doing, forcing the bar out of business and depriving the plaintiffs of their property.

In contrast, the record is devoid of evidence that the County Defendants were involved at all beyond the assistance they offered the city on one night. Sheriff Savokinas routinely agreed to help in multi-jurisdictional operations, and there is no

11

evidence he or his office acted with discriminatory intent. Summary judgment in favor of the County Defendants on all claims was appropriate.

B.

In Count Four, the plaintiffs also allege a violation of substantive due process as a result of the City Defendants' denial of KOZ extension benefits. "To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." Chainey, 523 F.3d at 219. But not all property interests are "worthy" of substantive due process protection. Reich v. Beharry, 883 F.2d 239, 244 (3d Cir. 1989). And whether the property interest contains this "particular quality depends on whether that interest is fundamental under the United States Constitution." Newark Cab. Ass. v. City of Newark, 901 F.3d 146, 155 (3d Cir. 2018) (citation omitted).

For example, we have held that state-law entitlement to water and sewer services is not protected by substantive due process. Ransom v. Marrazzo, 848 F.2d 398 (3d Cir. 1988). There, we explained,

> [T]he legal fact that, once a municipality . . . establishes a utility for its citizens, a citizen's expectation of receiving that service rises to the level of a property interest cognizable under the Due Process Clause, merely brings that expectation within the compass of the Fourteenth Amendment's procedural protections . . . . It does not transform that expectation into a substantive guarantee against the state in any circumstance.

Id. at 412 (emphasis added) (citations omitted). We also held there is no property interest protected by substantive due process (or procedural due process) in

12

"Pennsylvania's competitive bidding statutes [that] require that public contracts be awarded to the lowest responsible bidder." Indep. Enter. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1178-80 (3d Cir. 1997). Likewise, "tenured public employment is a wholly state-created contract right" so it is not a "fundamental property interest entitled to substantive due process protection." Nicholas v. Pa. State Univ., 227 F.3d 133, 142-43 (3d Cir. 2000). The KOZ program provides tax benefits to certain businesses through an application — and re-application — process. The KOZ benefits are merely that — a benefit — and therefore are not fundamental rights protected by substantive due process under the Constitution. Therefore the "threshold requirement" for a substantive due process challenge is not met, Gikas v. Washington School Dist., 328 F.3d 731, 737 (3d Cir. 2003), and summary judgment for the City Defendants was appropriate.

## C.

Greco individually raises a claim of selective prosecution. He claims that Mayor Leighton and Chief Dessoye "influenced" an FBI agent to "manipulate" Greco "into becoming vulnerable to the charge of misprision." Pl. Br. 40. But the City of Wilkes-Barre did not charge him with misprision; the federal government did. Nor is there any evidence that Mayor Leighton and Chief Dessoye agreed to influence the FBI in any way. The District Court properly granted summary judgment to the City Defendants on this claim.

## IV.

For the foregoing reasons, we will vacate the District Court's summary judgment order on Counts One, Two, and Three as to the City and College Defendants and remand.[5] Summary judgment as to the County Defendants will be affirmed on all counts. Summary judgment on Counts Four and Six will be affirmed.[6]

---

[5] The City Defendants argue that summary judgment was proper on these counts for an alternative reason: that they are entitled to qualified immunity on the disputed facts. But the District Court did not reach this issue, so on remand the court should consider the qualified immunity of each City Defendant in the first instance. See Grant v. City of Pittsburgh, 98 F.3d 116, 123 (3d Cir. 1996).

[6] Pursuant to 28 U.S.C. § 1367(c)(3), the District Court declined to exercise supplemental jurisdiction over Count Five, a tortious interference claim under state law. Because we are vacating and remanding claims over which the District Court has original jurisdiction, we will also vacate the court's order as to supplemental jurisdiction and remand.