In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1629

WANDA GOODPASTER *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF INDIANAPOLIS, CITY-COUNTY
COUNCIL OF THE CONSOLIDATED CITY
OF INDIANAPOLIS, MARION COUNTY,
INDIANA, AND MAYOR OF INDIANAPO-
LIS, INDIANA,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-00669 — **Richard L. Young**, *Chief Judge.*

ARGUED SEPTEMBER 16, 2013 — DECIDED NOVEMBER 25, 2013

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Appellants, who own bars in
Indianapolis-Marion County, Indiana, filed suit seeking
injunctive and declaratory relief against enforcement of the

2012 Indianapolis-Marion County smoking ordinance. The district court denied the bar owners' motion for a preliminary and permanent injunction and entered judgment in favor of the City. The bar owners now appeal.

## I. BACKGROUND

In 2005, the City-County Council of Indianapolis and Marion County passed an ordinance prohibiting smoking in most buildings frequented by the general public. Indianapolis, Ind. Mun. Code §§ 616-201–04 (2010) (amended 2012). The City-County Council excepted several businesses from the ban, including bars and taverns with liquor licenses that neither served nor employed people under the age of eighteen, tobacco bars, and bowling alleys. *Id.* at § 616-204.

Seven years later, in 2012, the City-County Council expanded the 2005 ordinance by eliminating many of its exceptions. Indianapolis, Ind. Mun. Code § 616-204 (2013). As amended, the ordinance included exceptions for private residences, retail tobacco stores, tobacco specialty bars, and private clubs that voted to permit smoking. *Id.* The amended ordinance thus prohibited smoking in most Indianapolis bars and taverns.

A group of Indianapolis-Marion County bar owners affected by the ordinance then brought suit seeking declaratory and injunctive relief from the ordinance. In their amended complaint, they asserted due process, equal protection, takings and freedom of association claims under both the federal and Indiana constitutions. The bar owners filed a motion for a preliminary injunction, and the City filed a motion to dismiss for failure to state a claim. The district court consolidated the

hearing on the preliminary injunction with a hearing on the merits.

At the hearing, several of the bar owners testified about the negative economic effects of the ordinance. All who were asked denied they were facing insolvency. The bar owners also proffered an expert, Dr. John Dunn, to testify that secondhand smoke exposure does not have negative health effects. Dr. Dunn is an emergency room doctor and professor who acquired his knowledge of epidemiology by reviewing the relevant literature and by speaking with his colleagues who were experts in the field. The bar owners submitted an expert report on Dr. Dunn's behalf titled "Dr. Dunn's Report to the Ohio Legislature." When the court asked about this report, Dr. Dunn said he didn't realize the bar owners had represented it as an expert report, and that he wouldn't have submitted it as such. During cross examination, Dr. Dunn readily acknowledged an article he wrote for the Heartland Institute in which he described those who opposed smoking as members of the "High Church of Holy Smoke Haters" and characterized Chicago, which had banned smoking, as "an anxious, slightly overweight suburbanite fretting over cigarette smoke."

The City also called an expert, Dr. Andrew Hyland, to testify as to the health effects of secondhand smoke. Dr. Hyland has a Ph.D. in epidemiology and has published more than 100 peer-reviewed articles on the effects of secondhand smoke. He testified that there had been scientific consensus since 2000 that secondhand smoke causes disease. He based his testimony primarily on the Surgeon General's 2006 report, *The Health Consequences of Involuntary Exposure to Tobacco Smoke*.

The City called a second expert, Dr. Terrell Zollinger, to testify as to the economic cost to the City from secondhand smoke. Dr. Zollinger is a professor of epidemiology at Indiana University's School of Public Health who has produced several

reports on the economic impact of secondhand smoke in Marion County. To produce these reports, Dr. Zollinger first developed an attributable risk (i.e. the percentage of the risk of a disease that could be attributed to secondhand smoke exposure) for a condition based on the existing epidemiological research on secondhand smoke. Then, he multiplied this risk by the approximate cost of healthcare for someone with that particular diagnosis. This weighted cost estimate was then multiplied by the number of people diagnosed with that particular disease. He repeated this procedure for a number of diagnoses associated with secondhand smoke exposure. His final estimate of the costs of secondhand smoke exposure was $195,332,995.

Additionally, the City called Chris Gahl, the vice president of Visit Indy, an organization that promotes Indianapolis as a tourist destination as well as a site for conventions and other large events. He testified that Visit Indy supported the smoking ordinance because it believed the ordinance would attract new businesses, enhance visitors' experiences, and protect hospitality workers. Gahl further explained that when groups seek a host city for an upcoming convention, they often prefer cities with comprehensive smoking ordinances.

After the hearing, both the bar owners and the City filed their proposed findings of fact and conclusions of law. On March 6, 2012, the district court entered judgment in favor of the City, finding that the bar owners could not establish actual success on the merits of their claims. It also struck Dr. Dunn's testimony because he failed to provide an expert report as required by Fed. R. Civ. P. 26(a)(2). The bar owners now appeal.

## II. ANALYSIS

*A. Evidentiary Claims*

The bar owners make several claims of evidentiary error, challenging the district court's decision to admit and credit the testimony of the City's experts Dr. Hyland and Dr. Zollinger, its decision to strike Dr. Dunn's testimony, and its findings that the surgeon general released a study on the effects of second-hand smoke and that the bar owners were not insolvent.

*1. Expert Testimony*

*a. Dr. Hyland*

The bar owners first assert that the court clearly erred when it found that secondhand smoke causes disease. The court based this finding on Dr. Hyland's testimony, which it found credible. Specifically, the bar owners challenge the court's understanding of relative risk and the methods behind the Surgeon General's report which Dr. Hyland used throughout his testimony.

In a bench trial or hearing without a jury, the district court judge acts as both gatekeeper and factfinder. He must determine both whether expert evidence is admissible under Federal Rule of Evidence 702 and whether it is credible. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

These determinations, though often closely related to each other, require different levels of appellate scrutiny. When reviewing a district court's application of Rule 702, we review the court's choice of legal framework governing expert testimony *de novo*, while we review its decision to admit or exclude the proffered expert testimony for abuse of discretion.

*United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). Expert credibility determinations, on the other hand, are findings of fact, *Smith*, 215 F.3d at 718, and are thus reviewed for clear error. *Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013).

Thus, to properly analyze the bar owners' claims, we must determine whether they go to Dr. Hyland's credibility or the admissibility of his testimony under Rule 702. Rule 702 analysis focuses on the expert's methodology and the principles upon which his research rests. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 595 (1993) (noting that the focus of the Rule 702 inquiry is "solely on principles and methodology, not on the conclusions that they generate."). It is up to the trier of fact, however, to evaluate the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *Smith*, 215 F.3d at 718.

The challenge to the court's understanding of relative risk is essentially a challenge to the court's determination that Dr. Hyland was credible. Dr. Hyland's principles and methodology—epidemiology—provided a relative risk[1] value for secondhand smoke between 1.2 and 1.3. Dr. Hyland then offered the conclusion that this was sufficient to support a finding that secondhand smoke causes disease. The court

---

[1] Relative risk is the ratio of the rate of disease in people exposed to a risk factor to the rate of disease in people not exposed to the risk factor. Michael D. Green et al., *Reference Guide on Epidemiology*, *in Reference Manual on Scientific Evidence* 566 (3d ed. 2011). In this case, the relative risk compares the rate of disease in those exposed to secondhand smoke to the rate of disease in those without such exposure. A relative risk of one indicates no relationship between the risk factor and the disease. *Id.* at 567. A relative risk of less than one indicates a negative association between the risk factor and the disease. *Id.* A relative risk greater than one indicates a positive association. *Id.*

found this conclusion credible when it credited Dr. Hyland's testimony.

We give a district court's credibility determinations of expert witnesses "great weight." *United States v. Huebner*, 752 F.2d 1235, 1245 (7th Cir. 1985). In this case, there is no reason to disturb the district court's finding that Dr. Hyland was credible. He provided ample explanation for his conclusions; given the record, it cannot be stated with any certainty that the court's conclusion was in error.

The bar owners' challenge to the substance of the Surgeon General's report goes to the admissibility of Dr. Hyland's testimony, as it concerns his methodology and application of epidemiological principles. Thus, it would be evaluated under the abuse of discretion standard, were it properly preserved. But the bar owners did not object to Dr. Hyland's testimony on these grounds at trial, and the claim is forfeited. *See Jiminez v. City of Chicago*, – F.3d –, 2013 WL 5524787 (7th Cir. Oct. 7, 2013).

### b. Dr. Zollinger

The bar owners next argue that because Dr. Zollinger's expert testimony about the economic consequences of second-hand smoke was based on the epidemiological research establishing causation, the findings by the district court that credited Dr. Zollinger's testimony were clearly erroneous. As noted above, the district court did not clearly err in crediting Dr. Hyland's testimony that secondhand smoke causes disease; thus, it could not have clearly erred in finding that the health consequences of secondhand smoke had an adverse economic impact.

### c. Dr. Dunn

In its findings of fact and conclusions of law, the district court found that Dr. Dunn was not an expert in epidemiology and that his testimony was not credible. The court then

determined that the expert report he submitted, titled "Dr. Dunn's Report to the Ohio Legislature," was not an expert report for the purposes of Fed. R. Civ. P. 26(a)(2). It based this determination largely on Dunn's admissions at trial that the report was produced for political purposes and that Dunn himself would not have submitted it as an expert report. Because Dr. Dunn did not produce the required expert report, the court struck the entirety of his testimony.

The bar owners challenge these determinations, arguing that Dr. Dunn should have been certified as an expert, and that the district court should not have struck his testimony. To the extent either of these decisions was in error, however, it was harmless. *See Goodman v. Ill. Dep't of Fin. and Prof'l Regulation*, 430 F.3d 432, 439 (7th Cir. 2005) ("Even an erroneous evidentiary ruling can be deemed harmless if the record indicates that the same judgment would have been rendered regardless of the error."). The district court found Dr. Dunn's testimony not credible, and this finding withstands appellate review.

Nothing in the court's analysis requires us to disavow the "great weight" we typically accord expert witness credibility determinations. *Huebner*, 752 F.2d at 1245. The court noted the political tone of his testimony and his expert report, in particular Dr. Dunn's practice of referring to people who opposed secondhand smoke as the "High Church of Holy Smoke Haters." His strongly held and frequently expressed political views could reasonably be understood to have influenced the science he presented before the court. This coupled with the character of his expert report—a political document prepared for submission to the Ohio State Legislature—provided ample basis on which the district court could rest its finding that his testimony was not credible.

Thus, even had the district court considered Dr. Dunn an expert, it would have given his testimony little weight.

Particularly given that the court found the City's expert on the health effects of secondhand smoke credible, Dr. Dunn's testimony would have had minimal impact.

*2. Findings of Fact*

This court reviews a district court's findings of fact under the highly deferential clear error standard. *Furry*, 712 F.3d at 992. We will find clear error where, for example, the "trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence." *Id.* at 992 (quoting *EEOC v. Sears Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir. 1988)).

*a. The Surgeon General's Report is a study*

The bar owners also contend the district court erred by calling the Surgeon General's report on the health consequences of secondhand smoke a study rather than a report. While it is true that the Surgeon General did not conduct independent studies while compiling the report, the report reflects the result of a wide-ranging meta analysis. Meta analysis could, on its own, be considered a "study." Regardless, this finding is irrelevant to any of the constitutional claims the bar owners make, and any error is thus entirely harmless.

*b. The bar owners are not facing insolvency*

Finally, the bar owners argue that the district court erred by finding that the bar owners were not facing insolvency. They base this claim on several statements made at trial about the effect of the ordinance on the bar owners' businesses and the naked assertion that the bar owners must not have understood what "insolvency" meant when asked about it at the hearing. Like all findings of fact, however, this finding is reviewed only for clear error, and will be reversed only if we are left with the "definite and firm conviction that a mistake has been committed." *Furry*, 712 F.3d at 992 (quoting *Anderson v. City of Bessemer*

*City*, 470 U.S. 564, 573 (1985)). Mere speculation that the bar owners did not understand the question put to them cannot give rise to such a deeply-held conviction. And the testimony presented at trial about the financial effects of the ordinance is insufficient to support a finding of clear error, particularly in light of the fact that the bar owners explicitly denied they were facing insolvency.

*B. Due Process Clause*

The bar owners first make a substantive due process claim, arguing that the Indianapolis-Marion County smoking ordinance deprives them of rights without due process of law. Smoking does not fall alongside those rights we consider fundamental rights. *See Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012) (noting that the list of fundamental rights is a "short one" and that the Supreme Court has cautioned against recognizing new fundamental rights, as "guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended") (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

Because it does not infringe a fundamental right, the smoking ordinance will stand if it passes rational basis scrutiny. *Eby-Brown Co., LLC v. Wisconsin Dep't of Agriculture*, 295 F.3d 749, 754 (7th Cir. 2002). Under rational basis review, a state law is constitutional even if it is "unwise, improvident, or out of harmony with a particular school of thought." *Id.* (citing *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488 (1955)). The law must merely "bear[] a rational relationship to some legitimate end." *Id.* (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)). It is irrelevant whether the reasons given actually motivated the legislature; rather, the question is whether some rational basis exists upon which the legislature could have based the challenged law. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). Those attacking a statute on

rational basis grounds have the burden to negate "every conceivable basis which might support it." *Id.*

The bar owners have failed to meet this heavy burden. There are numerous reasons the City may have chosen to limit smoking in enclosed public spaces, and the bar owners have failed to disprove all of them. In addition to the negative health effects Dr. Hyland testified to in the district court, the City could have determined that they wanted to limit smoking in public places because it is annoying to nonsmokers, who are not used to inhaling smoke. It could also have reasoned that by banning smoking in public places, it would encourage more smokers to quit, improving health outcomes for more than just those exposed to secondhand smoke. Whatever the City's reasoning, the bar owners have failed to demonstrate that there is no rational basis on which a law restricting smoking in public places could be based.

### C. Equal Protection Clause

The bar owners also argue the ordinance denies them equal protection of the laws because while it bans smoking in traditional bars, smoking remains lawful in tobacco specialty bars.[2] The bar owners acknowledge this distinction does not rest on a suspect or quasi-suspect classification and is thus subject to rational basis review.

As noted above, rational basis review requires us to presume an ordinance is valid and to uphold it so long as it "bears a rational relation to some legitimate end." *Romer*, 517 U.S. at 631. Once we identify a plausible basis for the legislation, our inquiry is at its end. *United States R.R. Retirement Bd.*

---

[2] The ordinance defines "tobacco specialty bars" as businesses that do not sell cigarettes or permit cigarette smoking on their premises, that sell food only as an incident to cigars or hookah, and that earn at least 20% of their revenue from the sale of cigars or hookah.

*v. Fritz*, 449 U.S. 166, 179 (1980). When dealing with local economic regulation, "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *Listle v. Milwaukee Cty.*, 138 F.3d 1155, 1158 (7th Cir. 1998) (internal citations omitted). The analysis is slightly different than for the due process claim discussed above. Rather than identify a rational reason for infringing on citizens' ability to smoke in public, we must identify a rational reason for the distinction the ordinance draws between traditional bars and tobacco specialty bars.

The bar owners suggest that because the council members could not articulate a reason for the cigar bar exception, the legislation lacked a rational basis. But they mischaracterize the nature of rational basis review: To uphold a legislative choice, we need only find a "reasonably conceivable state of facts that could provide a rational basis" for the classification. *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal citations omitted). The actual motivation (or lack thereof) behind the legislation is immaterial.

The bar owners also argue that because cigars are at least as harmful as cigarettes, permitting cigar smoking while banning cigarette smoking is arbitrary and capricious. Illogical reasons for a distinction, however, will not doom a classification supported by other rational reasons. In this case, the City could have been trying to protect public health by decreasing secondhand smoke exposure but simultaneously trying not to close all businesses where tobacco was sold or used. This was rational: while the City wants to decrease involuntary exposure to secondhand smoke, it does not want to ban smoking and tobacco use in its entirety. An effort to decrease involuntary exposure to secondhand smoke will naturally not be as concerned with bars whose business model is predicated on tobacco. Presumably, the patrons of cigar bars and hookah bars

are not being involuntarily subjected to secondhand smoke because they chose to patronize bars where smoking is a necessary and essential part of the experience.

The City thus drew a line between traditional bars, for whom tobacco sales and usage are incidental to their primary business of alcohol and food sales, and tobacco specialty bars, whose business models depend on tobacco sales. The bar owners essentially argue that this line was drawn incorrectly because it does not include their businesses, which also depend significantly upon on-site tobacco usage. But legislation "does not violate the Equal Protection Clause merely because the classifications [it makes] are imperfect." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). A law can be underinclusive or overinclusive without running afoul of the Equal Protection Clause. *New York Transit Authority v. Beazer*, 440 U.S. 568, 592 n.38 (1979).

Because the bar owners cannot establish that the ordinance lacked a rational basis, their equal protection claim must fail.

*D. Freedom of Association*

The bar owners further argue that the smoking ordinance inhibits their freedom of association. The Supreme Court has recognized two kinds of constitutionally-protected association: intimate association and expressive association. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). Socializing with friends and acquaintances at a neighborhood bar qualifies as neither.

Intimate association "protects the right 'to enter into and maintain certain intimate human relationships.'" *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005) (quoting *Jaycees*, 468 U.S. at 617–18). While this right does not exclusively protect family relationships, the Supreme Court has identified relationships that "attend the creation and sustenance of a family" as appropriate benchmarks for evaluating whether a

relationship qualifies for protection as an intimate association. *Jaycees*, 468 U.S. at 619–20. To determine whether a particular relationship qualifies as "intimate," courts consider factors including the size of the group, its exclusivity, its purpose, and whether outsiders are permitted to participate in critical aspects of the relationship. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987). The relationship between regular patrons of a particular bar is not an intimate association. A bar's clientele is not exclusive; any person on the street can drop in for a beer. This collection of patrons is also likely quite large, and lacks any distinct purpose other than diffuse socializing. And however you define the "critical aspects" of the relationship between people who drink at the same bar, it is hard to imagine the bar owners preventing willing customers from taking part.

Expressive association, on the other hand, "ensures the right to associate for the purpose of engaging in activities protected by the First Amendment." *Montgomery*, 410 F.3d at 937. To qualify, a group must "engage in some form of expression, whether it be public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). Thus, to determine whether the bar owners enjoy the protection of the expressive associational right, we must first determine whether they engage in expressive association. On this point, *City of Dallis v. Stanglin*, 490 U.S. 19 (1989), is instructive. In that case, the appellants alleged that a Dallas ordinance that restricted attendance at certain dance halls to minors and certain adults infringed their First Amendment rights. *Id.* at 22–23. The Court noted that while "it is possible to find some kernel of expression in almost every activity a person undertakes … such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* at 25. Accordingly, the Court found that the First Amendment did not protect "coming together to engage in recreational dancing." *Id.*

Similarly, the First Amendment does not protect coming together at a local bar to smoke. Bar regulars are not a group "organized to engage in speech," *see id.* at 25, or an association that "seeks to transmit … a system of values," *see Dale*, 530 U.S. at 650. Because the bar patrons do not engage in expressive association, the ordinance does not violate their First Amendment rights.

*E. Takings*

The bar owners next raise a takings claim, contending that the smoking ban goes "too far" and thus constitutes a taking.[3] Takings jurisprudence encompasses four basic claims: permanent physical invasion, deprivation of all beneficial economic use, exactions, and partial regulatory takings. *Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528, 538–39 (2005). The bar owners'

---

[3] We note that the bar owners seek an injunction to bar the alleged taking. Typically, injunctive relief is not available under the Takings Clause. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking."); *see also Warner/Elektra/Atlantic Corp. v. Cty. of DuPage*, 991 F.2d 1280, 1285 (7th Cir. 1993) (explaining that a state can "oppose injunctions against takings on the ground that the owner's only right is to monetary compensation …"). However, the City did not object to the appropriateness of an injunction on appeal, and thus has forfeited this argument. *See United States v. Parker*, 609 F.3d 891, 896 (7th Cir. 2010).

Relatedly, the bar owners also assert that there are different takings tests under the Fifth and Fourteenth Amendments, citing *Williamson County. v. Hamilton Bank*, 473 U.S. 172, 197 (1985). According to the bar owners, government action that has the same effect as an eminent domain taking is simply invalid as a violation of the Fourteenth Amendment's due process clause. *Id.* The Supreme Court, however, has never endorsed this purported difference; the cited portion of *Williamson County* refers to one party's argument, the merits of which the Court did not address. *Williamson County*, 473 U.S. at 199–200.

argument calls to mind the partial regulatory takings line of cases,[4] and thus will be evaluated in accordance with *Pennsylvania Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), and its progeny. A court applying *Penn Central* considers several factors to determine whether a diminution in value amounts to a taking: (1) the nature of the government action, (2) the economic impact of the regulation, and (3) the degree of interference with the owner's reasonable investment-based expectations. *Bettendorf v. St. Croix Cty.*, 631 F.3d 421, 430 (7th Cir. 2011). These factors do not provide a "set formula" for determining whether a taking has occurred, but rather are "designed to bar Government from forcing some people alone to bear public burdens which, in fairness and justice, should be borne by the public as a whole …" *Penn Central*, 438 U.S. at 123–24 (internal quotations omitted).

The bar owners have clearly established a negative economic impact on their respective businesses. Regardless of whether they are facing insolvency, they have demonstrated a decrease in sales since the smoking ordinance went into effect. But mere loss of future profits is a "slender reed" upon which to rest a takings claim. *Andrus v. Allard*, 444 U.S. 51, 66 (1979) ("Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform."). This is particularly true when an otherwise weak economy supplies an obvious potential confounding factor. Further, it is inappropriate to consider only the loss due to

---

[4] The bar owners cite an Indiana state case as providing the appropriate test to evaluate a federal takings claim. While we cannot evaluate a federal claim based on the law as determined by a state court, the citation clarifies that the bar owners intend to evoke the partial regulatory takings case law. The case cited, *Town of Georgetown v. Sewell*, 786 N.E.2d 1132 (Ind. App. 2003), describes a regulation that "places limitations on land that fall short of eliminating all economically beneficial use." *Id.* at 1139. This describes a partial regulatory taking.

prohibited uses, without also considering "the many profitable uses to which the property could still be put." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 331 (1987).

The remaining factors do not favor the bar owners' case. While the smoking ban may interfere with some reasonable investment-based expectations, it does not do so to a degree significant enough to find a taking. Assuredly, the bar owners have continued to invest in upkeep and improvements to their bars, and the smoking ban, which appears to have decreased their profits, would have diminished the return on these investments. That said, smoking in public places has been regulated in Indianapolis-Marion County since 2005, when the first ordinance was enacted. It should not have come as a surprise that the ordinance was later expanded to include appellants' businesses. *See Connolly v. Pension Guar. Corp.*, 475 U.S. 211, 226 (1986) ("Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations."). Finally, the smoking ban is a prototypical example of a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. Such character weighs heavily against finding a taking. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485 (1987) (refusing to find a taking where the government "acted to arrest what it perceive[d] to be a significant threat to the common welfare."). The smoking ordinance does not constitute a taking, and the bar owners are not entitled to relief on this claim.

*F. Ninth Amendment*

The bar owners also assert that the Ninth Amendment shields them from the smoking ordinance. This argument is a non-starter, as the Ninth Amendment "is a rule of interpreta-

tion rather than a source of rights." *Froehlich v. Wisconsin Dep't of Corr.*, 196 F.3d 800, 801 (7th Cir. 1999); *see also Quilici v. Village of Morton Grove*, 695 F.2d 261, 271 (7th Cir. 1982) (noting that "the Supreme Court has never embraced this theory.").

*G. Indiana State Claims*

Additionally, the bar owners raise four claims under the Indiana Constitution: (1) a privileges and immunities claim based on article 1, section 23, (2) a due process claim under article 1, section 21, (3) a freedom of association claim under article 1, section 9, and (4) a takings claim under article 1, section 23.

*1. Due Process, Freedom of Association, and Takings Clause*

The district court dismissed these three claims, finding that the bar owners had failed to present evidence or argument in favor of them at the evidentiary hearing or in their Proposed Findings of Fact and Conclusions of Law, and that the claims were thus waived. The bar owners raised these claims briefly in their amended complaint, but did not provide any additional argument in support of them in their brief in support of the preliminary injunction, their reply to the City's motion to dismiss, or in their Proposed Findings of Fact and Conclusions of Law.[5] They never cited a case describing Indiana law in these areas, and did not connect the facts they presented to any relevant Indiana constitutional provisions. They also failed to respond to the City's arguments against these claims in their reply to the City's motion to dismiss. Because they did not provide the district court with any basis to decide their claims,

---

[5] The bar owners did respond to a very specific allegation concerning their takings claim—that they had failed to exhaust state remedies—in a response to the City's second motion to dismiss. They did not, however, ever provide any legal basis for the state takings claim, instead focusing their energy on the federal case law.

and did not respond to the City's arguments, these claims are waived. *See Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n.1 (7th Cir. 1993) (argument waived where appellants "failed to develop the argument in any meaningful manner") (citing *Sanchez v. Miller*, 792 F.3d 694, 703 (7th Cir. 1986)); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver").

### 2. *Privileges and Immunities Clause*

The bar owners also claim that the Indiana Privileges and Immunities Clause bars enforcement of the smoking ordinance. While this section of the Indiana Constitution bears similarities to the federal Equal Protection Clause, the Indiana Supreme Court has explained that it "should be given independent interpretation and application." *Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994). Accordingly, that court has developed a two-step analysis for privileges and immunities claims. For a law that provides preferential treatment to one class over another to pass constitutional muster, the disparate treatment must be (1) reasonably related to inherent characteristics which distinguish the relevant classes and (2) uniformly available to all persons similarly situated. *Id.* at 78–80.

The first factor requires only that the disparate treatment be reasonably related to the characteristics which distinguish the unequally treated classes. *Dvorak v. City of Bloomington*, 796 N.E.2d 236, 239 (Ind. 2003). In this case, the unequally treated classes are the owners of traditional neighborhood bars as compared to the proprietors of cigar and hookah bars. The distinction here, as noted above, is the role tobacco ostensibly plays in each business model. For traditional neighborhood bars, smoking is incidental to the sale of food and alcohol. But for cigar bars and hookah bars, smoking and tobacco sales are their *raison d'être*. The distinction is thus reasonably related to

the City's decision to ban smoking in traditional bars but not cigar or hookah bars.

The disparate treatment is also sufficiently available to all persons similarly situated, despite the fact that some traditional bars are clearly more affected by the ordinance. The distinction drawn still means that bars for whom tobacco is an integral part of their business model—and not just an incidental yet important part—can permit smoking within their walls while other bars cannot. Further, even if we do think that the traditional neighborhood bars are more like cigar and hookah bars, the Indiana Supreme Court has refused to invalidate legislation simply because it is marginally over- or under-inclusive. *See Collins*, 644 N.E.2d at 80 (quoting *Cincinnati, Hamilton, and Dayton Ry. Co. v. McCullom*, 109 N.E. 206, 208 (1915)) ("Exact exclusion and inclusion is impractical in legislation. It is almost impossible to provide for every exceptional and imaginary case, and a legislature ought not to be required to do so at the risk of having its legislation declared void …"). The bar owners thus have not stated a valid claim under the Indiana Privileges and Immunities Clause.

### III. CONCLUSION

The bar owners cannot succeed on the merits of any of their myriad claims detailed above. The injunction the bar owners sought was thus unwarranted. We AFFIRM the district court's judgment in favor of the City.