

FILED

Oct 09 2019, 8:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| M.C., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner.* | October 9, 2019 <br><br> Court of Appeals Case No. <br> 19A-JV-703 <br><br> Appeal from the Rush Superior <br> Court <br><br> The Honorable Brian D. Hill, <br> Judge <br><br> Trial Court Cause No. <br> 70D01-1812-JD-94, 70D01-1805- <br> JD-31 |

**Altice, Judge.**

# Case Summary

M.C. was sixteen years old when the juvenile court declared him a ward of the Indiana Department of Correction (DOC). M.C. now appeals, claiming that the juvenile court abused its discretion in awarding wardship to the DOC, that such a determination violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Equal Privileges and Immunities Clause of the Indiana Constitution, and also violated the cruel and unusual punishment provision of the Eighth Amendment to the United States Constitution and the proportionality clause of the Indiana Constitution. We affirm.

# Facts & Procedural History

On March 23, 2018, officers from the Rushville Police Department responded to a report of a fight and observed fifteen-year-old M.C. and another individual leaving the area. When asked for identification, M.C. provided a false name to one of the officers. M.C. smelled of alcohol and submitted to a portable breath test, which revealed a blood alcohol level of .05%.

On May 11, 2018, the State filed a petition alleging that M.C. was a delinquent child. M.C. admitted the allegation, and the parties agreed to an immediate disposition. M.C. was placed under the supervision of the county probation department for six months and was ordered to submit to random drug testing. The juvenile court also required M.C. to attend school regularly and to not possess and use marijuana or other controlled substances.

[4] On October 2, 2018, the State filed a petition to modify the disposition, alleging that M.C. had admitted to continued marijuana use, failed to submit a urine sample on August 20, 2018, was suspended from school for two days on September 10, 2018, and was again suspended for smoking tobacco on September 13, 2018. Before the juvenile court held an initial hearing on that petition, the State filed an amendment on December 18, 2018, adding allegations that M.C. was referred to the probation department for committing theft, that he was suspended from school again in October and early November for possessing marijuana, had been again referred to the probation department for marijuana possession, and that he was expelled from school on November 20, 2018.

[5] The evidence showed that during M.C.'s suspension meeting at the school on November 14, 2018, M.C. stated that he "want[ed] to join the military. I want to kill people. I would like to kill people. I love violence and blood. You know I almost killed <omit> (sic) right?" *Appendix Vol. II* at 93. The theft allegation arose out of an October 13, 2018 incident where M.C. went to a Pizza King, ordered a pizza and two drinks with another juvenile, ate the food and then left without paying. M.C. admitted that it was his idea to avoid paying.

[6] In November 2018, a resource officer for Rush County Schools was handed a foil ball by the dean of students that had been obtained from M.C. The officer unrolled the aluminum foil and observed suspected marijuana inside. M.C. volunteered to the officer that it was "good stuff." *Id.* at 125. The act of theft

from Pizza King and M.C.'s possession of marijuana in November resulted in another allegation of delinquency.

[7] At a hearing on February 12, 2019, M.C. admitted to the allegations in the modification and those set forth in the delinquency petition. M.C. also admitted that he had smoked marijuana the previous Friday and a few days prior to that. The juvenile court ordered M.C. detained at the Youth Opportunity Center (YOC) until his scheduled dispositional hearing on February 26, 2019.

[8] The record shows that M.C. had previously been diagnosed with ADHD and had received counseling and medication for that condition. In 2015, M.C. received a competency evaluation, outpatient sex offender treatment, and a psychosexual risk assessment and evaluation. In light of a proceeding through the Department of Child Services (DCS), M.C. received inpatient treatment, individual and group therapy, and substance abuse treatment at Wernle Youth and Family Treatment Facility (Wernle) in 2016. Following discharge from Wernle, M.C. was provided with various services to assist him transition to his residence. Those services, which included home-based individual and family therapy, medication management, and a mentor, took place three times per week. The services ceased in January 2017, when DCS terminated its case.

[9] At the February 26 dispositional hearing, the Rush County probation officer recommended that wardship of M.C. be awarded to the DOC. The probation officer made that recommendation based on unsuccessful community and

home-based treatment and residential placement services through Marion County probation, Marion County DCS, Rush County probation, and Rush County DCS. When the probation officer spoke with M.C. regarding the disposition, M.C. indicated that if he was placed on home detention, he would continue to have access to drugs and would have others bring marijuana and other drugs to him. M.C. testified at the hearing that he possessed and smoked marijuana on November 14, because it was his birthday and it "took the edge off." *Transcript Vol. II* at 39.

[10] In the end, the juvenile court granted wardship of M.C. to the DOC. Following the hearing, the juvenile court stated

> [M.C.], I don't have any choice other than to recommend the, uh, wardship to [the] Department of Corrections. You've been through the probation system several times, received services from Probation, DCS. [I]t's clear to this Court, this isn't a matter of impulse control or some psychological disorder or strong addiction problem. This is that you don't have any regard for the rules. You don't see why they would be important and nothing's gonna change until you decide to change. And the fact that you may have, may or may not have come to some realization in the last week, um, doesn't mean a whole lot at this point. Um, you've been on probation. You've continued, you just do whatever you want. We have a Court hearing and by the time we have another hearing you do something else and just keep it up until now. So, um, the only time where you haven't violated really between court hearings is the time that you've been secured . . . in [the] YOC. So . . . it's a DOC commitment . . . [and you will be] held at the YOC in secure, um, detention until you can be transported to the Department of Corrections.

*Transcript* at 33.

On March 19, 2019, M.C. was transferred to the Pendleton Juvenile Correctional facility after completing the DOC intake phase. As a ward of the DOC, M.C. will participate in programs that will include a "growth phase" and a "transition phase." *Appendix Vol. II* at 157. During the growth phase, a treatment plan will be developed for M.C. Once M.C. has successfully completed that program, M.C. will move to the transition phase, which involves the development of an aftercare plan. M.C.'s release from the DOC "will depend primarily on how well [M.C.] progresses in his program." *Id.*

M.C. now appeals.

## I. Abuse of Discretion

### *A. Standard of Review*

In addressing M.C.'s claim that the juvenile court abused its discretion in granting wardship to the DOC, we observe that the choice of the specific disposition of a juvenile adjudicated a delinquent child will only be reversed if the juvenile court abuses its discretion. *J.S. v. State,* 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). The juvenile court's discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition. *C.C. v. State*, 831 N.E.2d 215, 216–17 (Ind. Ct. App. 2005). An abuse of discretion occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and

circumstances before the court or the reasonable, probable, and actual inferences that can be drawn therefrom. *Id.* The juvenile court is accorded wide latitude and great flexibility in its dealings with juveniles. *C.T.S. v. State*, 781 N.E.2d 1193, 1203 (Ind. Ct. App. 2003).

[14]   Ind. Code § 31-37-18-6 sets forth the following factors that a juvenile court must consider when entering a dispositional decree:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that
>
> (1) is: (A) in the least restrictive (most family like) and most appropriate setting available; and (B) close to the parents' home, consistent with the best interest and special needs of the child; (2) least interferes with family autonomy; (3) is least disruptive of family life; (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[15]   Although the statute requires the juvenile court to select the least restrictive placement, it allows for a more restrictive placement under certain circumstances. *K.A. v. State*, 775 N.E.2d 382, 386-37 (Ind. Ct. App. 2002), *trans. denied.* That is, the statute requires placement in the least restrictive setting only "[i]f consistent with the safety of the community and the best interest of the child." *See* I.C. § 31-37-18-6. Thus, the statute recognizes that in certain situations the best interest of the child is better served by a more restrictive placement because "commitment to a public institution is in the best

interest of the juvenile and society." *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005).

[16] Here, the evidence establishes that many less restrictive rehabilitative efforts have failed to reach M.C. and have not produced positive changes in his behavior. Indeed, M.C. has admitted that he intended to continue using illegal drugs, and he possessed marijuana during the pendency of the modification petition. These are certainly compelling reasons for a more closely-supervised and restrictive environment than a setting that would permit M.C. to reoffend and disregard the juvenile court's rules.

[17] M.C.'s continued marijuana use, the commission of additional offenses, school suspensions, and the act of theft *after* his involvement with the juvenile justice system warranted the juvenile court's determination that a more intensive services program involving a supervised environment is necessary to prevent M.C. from continuing to commit acts that are harmful to himself and the community. Put another way, M.C.'s wardship to the DOC serves the juvenile justice system's purpose, inasmuch as intervention was needed to prevent M.C.'s behavior from declining, with the hope that M.C. will not commit criminal offenses as an adult. To that end, we conclude that the juvenile court did not abuse its discretion in ordering the wardship of M.C. to the DOC. *See C.C.,* 831 N.E.2d at 218-19 (observing that a juvenile's repeated involvement with the juvenile justice system and repeated failures at rehabilitation efforts, coupled with the failure to alter behavior despite several placements by the court were appropriate considerations for a grant of wardship to the DOC).

## II. Constitutional Issues

[18] M.C. presents several constitutional challenges on appeal regarding the wardship that he did not raise at the juvenile court level. While the State asserts that these issues are waived, our Supreme Court has determined that "[e]ven though the general rule is that failure to challenge the constitutionality of a statute at trial results in waiver of review on appeal, this Court as well as the Court of Appeals has long exercised its discretion to address the merits of a party's constitutional claim notwithstanding waiver." *Plank Cmty. Hosps. of Ind., Inc.,* 981 N.E.2d 49, 53 (Ind. 2013). We exercise our discretion to review M.C.'s claims.

### A. Federal Equal Protection and Article 1, Section 23 of the Indiana Constitution

[19] M.C. argues, *inter alia*, that imposing greater restrictions on M.C.'s liberty than what an adult offender would receive for the same conduct violates equal protection principles under the Fourteenth Amendment to the United States Constitution and those defined in Article 1, Section 23 of the Indiana Constitution. M.C. further contends that "the government action of committing M.C. to the DOC is *not* substantially related to a sufficiently important government interest." *Appellant's Brief* at 25 (emphasis in original).

[20] The Fourteenth Amendment to the United States Constitution provides in part that the government should not "deny to any person within its jurisdiction the equal protection of the laws." Because the juvenile justice statutes do not involve a suspect classification, rational basis review applies. *FCC v. Beach*

*Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). This is a heavy burden for M.C. to overcome, in that in accordance with a rational basis review, a statutory classification comes to court bearing "a strong presumption of validity," and the challenger must "negative every conceivable basis which might support it." *Id.* "To uphold a legislative choice, we need only find a 'reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1072 (7th Cir. 2013) (quoting *Heller v. Doe,* 509 U.S. 312, 320 (1993)).

[21] States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000). A statutory classification will not be overturned under rational basis review unless the varying treatment is so unrelated to the achievement of a legitimate purpose that a reviewing court can only conclude that the government's actions were irrational. Because M.C. is arguing his equal protection right was violated because he was not treated as an adult offender would be, M.C. must demonstrate that there is no rational basis to treat juvenile delinquents differently than adult offenders. *See id.* at 83-84.

[22] M.C. correctly acknowledges that cases have applied the rational basis review to classifications based on age, yet he claims that is only because the classifications have been based on *advanced* age rather than youth. He argues that there should be a heightened standard of review because juveniles cannot vote for judges, legislators, and prosecutors. Hence, he asserts that juveniles are

"those least likely to obtain legislative cures for their disparate treatments." *Appellant's Brief* at 20.

[23]    This argument is unavailing. The United States Supreme Court has determined that advanced age is not a suspect class because it "does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it." *Kimel*, 528 U.S. at 83. Similarly, it cannot be said that youth is a "discrete and insular minority," because all persons, including everyone drafting, interpreting, and applying the laws involved in a juvenile-delinquency case, will have experienced life as a juvenile.

[24]    Indiana has long recognized that its juvenile system is directed toward providing "aid to the juvenile to direct his behavior so that he will not later become a criminal." *Jordan v. State*, 512 N.E.2d 407, 408 (Ind. 1987). The juvenile justice system was founded on the principle of *parens patriae*, which allows courts to step into the shoes of the parents when required. *In re K.G.*, 808 N.E.2d 631, 635 (Ind. 2004). That notion permits juvenile courts to care for and further the best interests of the child, "which implies a broad discretion unknown in the adult criminal court system." *Id.* at 636.

[25]    None of the dispositional options available to the juvenile court amount to "sentences" for "crimes." *Jordan*, 512 N.E.2d at 408. "When a juvenile is found to be delinquent, a program is attempted to deter him from going further in that direction in the hope that he can straighten out his life before the stigma of criminal conviction and the resultant detriment to society is realized." *Id.* at

408-09. Instead of a punishment, the recommended wardship to the DOC ensures that the juvenile "receives, in a secure environment, the extended rehabilitative counseling" needed. *S.C. v. State*, 779 N.E.2d 937, 940 (Ind. Ct. App. 2002), *trans. denied.* M.C.'s own argument demonstrates that disparate treatment between adults and juvenile offenders is required to address the nuances of youth.

[26] Additionally, *Roper v. Simmons*, 543 U.S. 551 (2005) and *Graham v. Florida*, 560 U.S. 48 (2010), both highlight the widely-held belief that juveniles are different because of a diminished capacity to appreciate the nature of their actions and a greater capability to change. *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68-69. While neither case mandates a separate system for juvenile offenders, the considerations that support less-severe treatment when juveniles are sentenced as adults, also support the State's legitimate interest in a separate juvenile justice system. The ability of juveniles to demonstrate changed behavior advances the State's goal of providing a separate system that focuses on reformation.

[27] As discussed above, the juvenile justice system had provided M.C. less-restrictive alternatives, like community and home-based therapy, before the juvenile court resorted to granting wardship to the DOC. The DOC was not granted wardship of M.C. because M.C. *only* possessed marijuana or *only* failed to pay for some pizza. Rather, it is apparent that the juvenile court resorted to the DOC for the purpose of reforming M.C.'s behavior before M.C. reached adulthood because M.C. demonstrated that he would ignore other less-

restrictive attempts at reformation. M.C.'s treatment by the juvenile court was well suited to provide structured guidance and personalized rehabilitative services to him. As a result, the separate systems for juvenile delinquents and adult criminal offenders are rationally related to the goal of ensuring rehabilitation of juveniles. *See K.G.*, 808 N.E.2d at 636 (holding that the State can adjust the legal system to account for children's vulnerability and needs). M.C.'s Equal Protection Argument under the Fourteenth Amendment fails.

[28] Turning to M.C.'s claim that he was denied the privileges and immunities guaranteed under the Indiana Constitution, Article 1, Section 23 of the Indiana Constitution (Section 23) provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." Section 23 is given independent interpretation and application from federal Fourteenth Amendment claims. *Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994). This section imposes two requirements on statutes that grant unequal privileges or immunities to different classes of persons: 1) the disparate treatment must be reasonably related to inherent characteristics that distinguish the unequally treated classes; and 2) the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. *League of Women Voters of Indiana, Inc. v. Rokita*, 929 N.E.2d 758, 770 (Ind. 2010). The first prong has two necessary components. *Ledbetter v. Hunter*, 842 N.E.2d 810, 813 (Ind. 2006). Specifically, the classification must initially be based upon distinctive, inherent characteristics that rationally distinguish the disparately treated class. *Id.* And

secondly, the disparate treatment must be reasonably related to the distinguishing characteristics. *Id.*

[29] Reviewing courts give substantial deference to legislative discretion when framing laws under the Indiana Constitution. *League of Women Voters*, 929 N.E.2d at 770; *Ledbetter*, 842 N.E.2d at 812-13. So long as a classification is based upon substantial distinctions, we will not substitute our judgment for that of the legislature nor inquire into motives prompting such classification. *See Ledbetter,* 842 N.E.2d at 813. To succeed on such a claim, the challenger must negate every conceivable basis which might have supported the classification. *Id*.

[30] In our view, distinguishing between juvenile delinquents and adult offenders is rationally related to the goal of promoting rehabilitation among juvenile delinquents. Restrictive placements, including the DOC, can promote rehabilitation and the policy of individual accountability. *S.C.*, 779 N.E.2d at 940; *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied.* Here, M.C. can essentially control the length of his placement in the DOC. As soon as he completes his program and demonstrates that he has been rehabilitated, he will be released from the DOC.

[31] Additionally, M.C.'s argument, under both the Fourteenth Amendment and Section 23, makes much of the fact that M.C. was sent to the DOC rather than a county jail. While it is unlikely that an adult offender would be incarcerated at a DOC facility rather than a county jail for the commission of these offenses,

*see* I.C. § 35-38-3-3, M.C. offers no reason why the distinction between a county facility and a statewide DOC facility specifically designed to meet the needs of a juvenile is a meaningful distinction that would support a claim of unconstitutional disparate treatment. To the contrary, this type of disparate treatment seems to address the uniqueness of juvenile offenders and provides more specialized rehabilitative efforts that might otherwise be unavailable or impractical for such offenders.

[32] For all these reasons, we conclude that M.C. has failed to show that the wardship in favor of the DOC violated either the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, or Article 1, Section 23, of the Indiana Constitution.

### B. Cruel and Unusual Punishment Under the Eighth Amendment and the Proportionality Clause Under the Indiana Constitution

[33] M.C. maintains that his loss of liberty is disproportionate with what an adult would receive for the same conduct and that juveniles are inherently less culpable than adults. Therefore, M.C. argues that the disposition declaring him a ward of the DOC violates the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution and the proportionality clause of the Indiana Constitution.

[34] The Eighth Amendment prohibits the infliction of cruel and unusual punishment. Article 1, Section 16 explicitly requires that "All penalties shall be proportioned to the nature of the offense." Punishment for a crime should be

graduated and proportioned to the offense, and the concept of proportionality is central to the Eighth Amendment. *Graham*, 560 U.S. at 59. Both clauses apply to the criminal process—that is, to direct actions by the government to inflict punishment. *Browning-Ferris Indus. of Vt., Inv. v. Kelco Disposal, Inc.,* 492 U.S. 257, 260 (1989).

[35] The United States Supreme Court has recognized that juvenile proceedings are not criminal prosecutions. *McKeiver v. Pennsylvania*, 403 U.S. 528, 541 (1971). Similarly, our Supreme Court has held that juvenile delinquency is not a crime and juvenile dispositions are not criminal sentences. *See D.M. v. State*, 949 N.E.2d 327, 333 n.6 (Ind. 2011) (observing that juvenile proceedings are civil, not criminal, and are based on a philosophy of social welfare rather than criminal punishment); *see also T.K. v. State*, 899 N.E.2d 686, 687-88 (Ind. Ct. App. 2009) (declining to apply Indiana Rule of Appellate Procedure 7 to juvenile dispositions because juvenile disposition orders are not the same as criminal sentences).

[36] While our courts have yet to specifically address whether the Eighth Amendment applies to delinquency proceedings, the Illinois Supreme Court has concluded that its state juvenile code does not implicate Eighth Amendment concerns. In *In re Rodney H.*, 861 N.E.2d 623, 629-30 (Ill. 2006), the Illinois Supreme Court arrived at that conclusion, observing that the goal of the juvenile system is rehabilitation. *Id.* Ultimately, the Illinois court determined that a petition for adjudication for wardship was not an action to inflict

punishment.  Therefore, it determined that the Eighth Amendment does not apply to juvenile delinquency proceedings. *Id.*

[37] We adhere to the reasoning advanced in *Rodney H.,* in that the goal in Indiana is rehabilitation for its juvenile offenders.  A juvenile delinquency petition is not about the State seeking to punish a young offender.  Rather, our General Assembly has codified the goal of the juvenile system by requiring juvenile courts to consider the needs of the child, efforts made to prevent removal from the parents, and various services that must be offered to juvenile offenders.  I.C. § 31-37-18-9.[1]  Furthermore, our legislature has imposed strict requirements on juvenile facilities to provide recreation, education, counseling, and health care that must be operated by qualified staff to provide such programs and treatment.  *See* I.C. § 31-37-19-21.  Delinquency actions are designed to

---

[1] The juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record concerning approval, modification, or rejection of the dispositional recommendations submitted in the predispositional report, including the following specific findings:

    (1) The needs of the child for care, treatment, rehabilitation, or placement.

    (2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.

    (3) Efforts made, if the child is removed from the child's parent, guardian, or custodian, to:

    (A) prevent the child's removal from; or

    (B) reunite the child with;

    the child's parent, guardian, or custodian.

    (4) Family services that were offered and provided to:

    (A) the child; or

    (B) the child's parent, guardian, or custodian.

    (5) The court's reasons for the disposition.

*Id.*

rehabilitate and correct, and they encourage juveniles to "straighten out [their lives] before the stigma of criminal conviction and the resultant detriment to society is realized." *Jordan v. State*, 512 N.E.2d 407, 409 (Ind. 1987). Indeed, Article 9, Section 2 of Indiana Constitution states "The General Assembly shall provide institutions for the correction and reformation of juvenile offenders."

[38] Inasmuch as the juvenile court's dispositional order was not a penalty or punishment within the meaning of the Eighth Amendment to the United States Constitution, M.C.'s claim that awarding wardship to the DOC was cruel and unusual punishment and violated the proportionality provision of Article 1, Section 16 of the Indiana Constitution, is unavailing.

### III. Conclusion

[39] We conclude that M.C. has failed to show that the juvenile court's disposition granting wardship to the DOC was an abuse of discretion. Additionally, there was no violation of the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution or the Privileges and Immunities Clause of the Indiana Constitution. Finally, we conclude that juvenile proceedings are not criminal in nature and do not amount to a direct action by the State to inflict punishment upon a juvenile. Therefore, neither the cruel and unusual punishment clause under the United States Constitution nor the proportionate penalties clause under the Indiana Constitution is implicated.

[40] Judgment affirmed.

Brown, J. and Tavitas, J., concur.