**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 16, 2020
Decided February 1, 2021

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 20-1018

| | |
|---|---|
| RDB PROPERTIES, LLC, *et al.*, | Appeal from the United States District |
| *Plaintiffs-Appellants*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:19-cv-05700 |
| CITY OF BERWYN, | Charles P. Kocoras, |
| *Defendant-Appellee*. | *Judge*. |

**ORDER**

This case arose when the City of Berwyn allowed a local business to demolish residential homes that the company owned and to construct a private parking lot on the cleared space. Nearby property owner RDB Properties and its member-manager David Miklos ("RDB plaintiffs") sued the City, alleging that it had violated their Fifth Amendment rights by effecting an illegal taking. The district court granted the City's motion to dismiss for failure to state a claim. We too conclude that the complaint failed to state any type of takings claim and thus affirm.

# I

As set forth in the RDB plaintiffs' complaint, the allegations of which we accept as true for present purposes, *Degroot v. Client Servs.*, 977 F.3d 656, 659 (7th Cir. 2020), in late 2014 the City of Berwyn granted a zoning variance to the Turano Baking Company, which wanted to expand its premises onto residential property south of its existing facility. Turano had acquired these lots over the years with this improvement in mind. The first step involved rezoning the area from residential to mixed use. An existing parking lot stretched along one side of the street behind the business premises; the expanded lot ran along the other side of the street. Two streets run perpendicular to the parking lot.

The City agreed to allow Turano to cut off access to the re-configured parking lot from the perpendicular streets by ending them in cul-de-sacs. This had the effect of depriving RDB plaintiffs, whose property lay near the end of one of the newly blocked roads, of parking spaces on the city streets. The loss of street parking, they contended, diminished the value of their property. They also complained that without the street parking they had lost spots suitable for handicapped parking and that there was an aesthetic injury. Finally, they asserted that the value of their property suffered because of the increased noise, lighting, traffic, and safety problems stemming from the City's failure to enforce parking-lot ordinances.

After requests to the City for compensation for these harms proved futile, the RDB plaintiffs sued the City under the Fifth Amendment of the U.S. Constitution for taking their property without just compensation. The City moved to dismiss the complaint for failure to state a claim. It argued that it had no role in the alleged taking because the actions at issue were those of Turano, a private entity.

The district court granted the City's motion to dismiss, though on different grounds. The court disagreed with the City's contention that the plaintiffs' harm arose only from Turano's actions; the City, the court pointed out, facilitated Turano's actions by granting a zoning variance to the company, transferring public land to the company, and approving the company's parking-lot design and the cul-de-sac construction. Nevertheless, the court continued, none of the plaintiffs' allegations was "severe enough" for a constitutional taking. The plaintiffs failed, in the court's view, to allege that their injuries—the increased noise, traffic, security risk, excess light, loss of aesthetic value and on-street parking—denied them "all" or an "essential" use of their property, which the court reasoned was necessary to state a takings claim. *Barbian v. Panagis*, 694 F.2d 476 (7th Cir. 1982). It therefore entered judgment for the City.

## II

The Fifth Amendment prevents the government from taking private property for public use without just compensation. U.S. CONST. AMEND. V. The Takings Clause protects private persons from government action that forces them disproportionately to bear a burden that should be shouldered by the general public. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). A wide range of government actions may require just compensation under the Fifth Amendment, including permanent physical invasions, deprivation of a property's entire value, exactions, and regulations that unduly interfere with property rights. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1074–75 (7th Cir. 2013).

The Supreme Court has identified two categories of takings that require compensation. *Lingle*, 544 U.S. at 537. The first is a per se taking. *Id*. Per se takings are easy to spot—they occur when the government physically seizes private property or directly appropriates it. *Id*. The second category is a regulatory taking, which occurs when government regulation of private property becomes sufficiently onerous. *Id*. Takings come in many forms, reaching even the smallest permanent physical invasion onto private property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (a mandate that forced owners to allow a cable to be attached to their buildings was a taking); compare *United States v. Jones*, 565 U.S. 400, 404–05 (2012) (physical occupation of property to attach a GPS device was a "search"). A taking also occurs with the deprivation of all economically beneficial use of a property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) (an ordinance that forbade the building of any habitable structure on beachfront lots was a taking). A regulatory taking arises from government action that interferes too much with private property interests. To determine whether a regulation "goes too far," courts weigh the factors set forth in *Penn Central Transp. Co. v. New York City*: (1) the economic impact on the claimant, (2) the extent of the regulation's interference with "investment-backed expectations," and (3) the character of the regulation. 438 U.S. 104 (1978).

The RDB plaintiffs contend that they suffered a per se, physical taking. Highlighting the fact that a tiny government encroachment on private property was enough to count as a taking in *Loretto* (a physical-occupation case), the plaintiffs characterize the City's cul-de-sac allowance as a physical encroachment on their nearby street parking.

But their argument misses one crucial point: they do not, and never have, owned any street parking places. It is impossible to suffer a taking of property that one does not have. Physical encroachment in a per se taking claim must be on private property.

*Muscarello v. Ogle Cty. Bd. of Comm'rs*, 610 F.3d 416, 421 (7th Cir. 2010). Plaintiffs allude to unspecified "property interests" that they have in valuable street parking, but they point to nothing that would support such interests. See *Loretto*, 458 U.S. at 427–28 (citing *N. Transp. Co. v. Chicago*, 99 U.S. 635 (1879) (obstructions impairing use of property, without entry onto the property, were not takings)). By neglecting to identify any physical intrusion on their own property, the plaintiffs failed to allege any kind of direct physical seizure. See *Griggs v. Allegheny Cty.*, 369 U.S. 84 (1962) (privately owned airspace).

Alternatively, the RDB plaintiffs maintain that they adequately alleged a regulatory taking. They argue that their allegations of property-value decline, resulting from the loss of street parking and increased disturbances, sufficiently proved the first two *Penn Central* factors—economic impact (severe, they say) and regulatory interference with investment-backed expectations. The RDB plaintiffs add that they can meet the third *Penn Central* factor—whether a regulation acts more like a direct taking than a mere exercise of governmental discretion—by alleging that the City's actions forced them disproportionately to bear the costs associated with Turano's expanded lot. (Put another way, they suggest that they have been impermissibly singled out to benefit the general public.)

But even if we take plaintiffs' statements as true, the complaint still fails to allege a regulatory taking. First, inferring such a taking is a tall order, as not every regulation that decreases property value qualifies for compensation. *Penn Central*, 438 U.S. at 144. Courts have dismissed suits that raise takings claims based on allegations of property-value losses. See, e.g., *Newark Cab Ass'n v. Newark*, 901 F.3d 146 (3rd Cir. 2018) (loss of taxi-medallion value); *Colvin Cattle Co. v. United States*, 468 F.3d 803 (Fed. Cir. 2006) (lease-and-permit cancellations). To plead a regulatory taking, the RDB plaintiffs needed to point to some property right—not just some value—lost as a result of the City's actions. *Newark Cab Ass'n*, 901 F.3d at 153.

A closer look at the RDB plaintiffs' two regulatory-takings claims—the loss of street-parking access and the loss of the property's aesthetic value—shows why they are legally inadequate. Plaintiffs first argue that the City's re-zoning took away their street-parking access. But the fact that street parking might be desirable or valuable does not show that the City's decision to eliminate a few spaces amounts to a taking, either from the standpoint of economic impact or interference with investment-backed expectations. See *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 695 (4th Cir. 2018) (alleged loss of 87% development value was not enough for a taking); see also 2A Nichols on Eminent Domain § 6.02 [5e, 9, 11, 14] (2020) (in the eminent domain context, government-enacted changes in private-property access do not generally entitle owners to compensation

under the Takings Clause). Nor did the RDB plaintiffs plausibly allege a deprivation of property rights, as opposed to an incidental decrease in property value. *Newark Cab Ass'n*, 901 F.3d at 153 (dismissing claim of taxicab license holders who alleged merely a diminution in the market value of their taxi medallions arising from City of Newark's failure to subject transportation network companies that provided ridesharing services to same regulatory burdens as holders).

The plaintiffs' loss-of-street-parking allegations fare no better under the third *Penn Central* factor, which asks whether the regulation should be characterized as a direct taking, rather than an exercise of governmental discretion. Contrary to the RDB plaintiffs' assertions, closing off some public-street surfaces for parking is not an invasion of private property. And the land on which Turano built its new parking spaces was property that it had acquired—it was not public land, and it was not land owned by the RDB plaintiffs. The City's only role was to re-zone it so that the parking lot would be a permitted use. Nothing in this picture even remotely approximates the type of government action *Penn Central* considers a taking. The City's decision to allow Turano to build a larger parking lot differs from the regulation in *Loretto*, where a governmental mandate—that private-property owners allow a physical attachment to their buildings—actually invaded the owners' right to exclude others from their property. 458 U.S. at 433. Here, the City's decision about how to use the public roads does not deprive the RDB plaintiffs of any stick in the proverbial bundle of property rights, as required by *Penn Central*.

The RDB plaintiffs fare no better under their alternative theory, which rests on the loss of their property's aesthetic value. They maintain that the aesthetic value of their property dropped because the City failed to require Turano to ensure that its parking lot complied with local requirements for fencing, landscaping, and lighting. The property's value fell further, they add, as a result of excess noise, light, and security risks caused by the increased traffic.

But this claim similarly falls short of satisfying *Penn Central*. Courts have been reluctant to find a taking when property values have dropped because of noise and light pollution. 2A Nichols on Eminent Domain § 6.02 [11] (government obstruction of light, air, and access is not a taking). Disturbances caused by the government must go beyond consequential damages to the property value before courts will find a taking. *Loretto*, 458 U.S. at 428; *United States v. Causby*, 328 U.S. 256, 265–67 (1946) (disturbance caused by overhead aircraft was a taking not because Causby's property value decreased, but because the noise eliminated Causby's ability to raise chickens on his land). The plaintiffs cannot convert a complaint about under-enforcement of local ordinances (generally not justiciable, see *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,

489 U.S. 189 (1989)) into a Takings Clause problem. And they did not suggest, for instance, that the unenforced ordinances somehow deprived them of a basic property right, such as the ability to use their property as residences.

Lastly, the RDB plaintiffs now assert that the district court should have allowed them to amend their complaint. But as far as we can tell, they never asked the district court for leave to amend, and they have not developed that request to any degree in this court. They therefore have at least forfeited this possibility. And in any event, they have not suggested how any amendment would cure the deficiencies in their complaint. See *Gonzales-Koeneke v. West*, 791 F.3d 801, 808-09 (7th Cir. 2015). We thus conclude that the district court properly dismissed this case.

AFFIRMED